# Ingram *v.* The State of Alabama.

## *Indictment for Murder.*

1. *Dying declarations, made in answer to questions; admissible.*—On the trial of one charged with murder, a declaration made by deceased as to the cause and circumstances of his death, while under conviction of impending dissolution, although part of it was in reply to questions asked him, is admissible.

2. *Cross-examination, conduct of, largely in the discretion of the court.*—There is no uniform rule governing the cross-examination of witnesses, but it rests largely in the discretion of the court, greater liberty being permissible when the witness shows partisanship, than when he evinces impartiality; and it must be a strong case to justify a reversal for too great latitude allowed in such examination.

3. *Character; what to be considered in estimating.*—The shadings, as well as the brighter hues, are to be considered in making up the estimate of character and reputation; and, when a witness had testified that he knew the character of the accused for peace and quietude, and that it was good, it is not error to allow him to be asked, on cross-examination, if he had not been informed that the defendant had "killed a man in the State of Georgia," and his answer was admissible in evidence.

4. *Self-defense; doctrine as to, stated.*—A charge which asserts that the necessity of self-defense, which justifies the taking of human life, must be present, imperious, and impending, or so appear to the defendant, is free from error.

5. *Same; what necessary to make out justifiable homicide in self-defense.* Charges which declare that, "to make out a case of justifiable homicide committed in self-defense," the evidence must show that the difficulty was not provoked or encouraged by the defendant; that he was, or appeared to be, so menaced at the time, as to create a reasonable apprehension of danger to his life, or grievous bodily harm, and that there was no other reasonable mode of escape from such impending evil, are proper.

| | |
|---|---|
| 67 | 67 |
| 94 | 29 |
| 67 | 67 |
| 96 | 86 |
| 67 | 67 |
| 98 | 7 |
| 98 | 49 |
| 67 | 67 |
| 100 | 72 |
| 102 | 98 |
| 67 | 67 |
| 103 | 70 |
| 67 | 67 |
| 120 | 308 |
| 67 | 67 |
| 128 | 60 |
| 67 | 67 |
| 144 | 390 |

6. *Same; charge which ignores duty of escaping from difficulty, in establishing; erroneous.*—On a trial for murder, when the accused relies on self-defense to justify the killing, charges which assert the right of the defendant to kill the deceased, if it reasonably appeared to him that the deceased intended to take his life, or inflict on him great bodily harm, but which ignore the fact, or principle, that, to establish this defense, there must have been no other safe mode of escape open to defendant, are properly refused.

APPEAL from Talladega Circuit Court.

Tried before Hon. L. F. Box.

Thomas Ingram, the appellant, was indicted at the spring term, 1877, of the Circuit Court of Talladega county, for the murder of Jack Coleman. On the trial the only eye-witness of the homicide, D. D. McDonald, testified that in the afternoon of October 19, 1876, about a half hour before sundown, he was going from his shop in Childersburg, Ala., to Sheely's store, and while walking across the open square, he saw Thomas Ingram, a white man, and Jack Coleman, a colored man, walking side by side, across the square. They crossed his path about ten steps in front of him, going in the direction of Green's store, which was in the south-eastern part of the square, and were engaged in conversation. Coleman was talking in an excited manner, but the witness could not hear what they said until immediately after they crossed his path, then he heard Ingram say to Coleman, "do not cut me with that knife." At this moment they "halted, made a half wheel, and stood face to face," and, as they were turning, Ingram, who had a shot gun on his shoulder, said to Coleman, "if you cut me, or try to cut me, I will shoot you." Witness then looked at Coleman, and saw that his hands were downward, his left hand by his side, and an open knife, with a blade about three inches long, in his right hand. Ingram and Coleman were as near to each other as they could stand, witness being about ten paces away. Coleman had the open knife in his right hand, which was downward, and drawn backward in striking position, far enough for witness to see the full length of the knife-blade. As Ingram said "do not cut me," he stepped slightly backward, took his gun off his shoulder, held the muzzle of it close to Coleman's breast and fired, the shot taking effect on the left side of his breast, and he fell immediately, and died about a week afterwards. The gun which Ingram used belonged to J. B. Green, to whose store Ingram went immediately after the shooting, and witness went on to Sheely's store. Jos. H. Keith heard the report of the gun, and, in a minute or two afterwards, saw Coleman lying on the ground. The shot entered his left breast, above the heart, and ranged inward, upward, and backward, making a hole large enough for the witness to insert three of his fingers. Coleman said he was going to die. The State then

[Ingram v. The State.]

asked the witness "what Coleman said about being shot, and who shot him." The defendant objected to the witness' testifying to Coleman's declaration, the court overruled the objection, and defendant excepted. The witness then stated, that Jack Keith asked Coleman if he had drawn his knife on Ingram, and that in reply to this question, Coleman said, that he did not draw his knife on him, and that "Ingram had shot him for nothing." According to the testimony of Lewis Taylor, a few moments before Coleman was shot, he was sitting with witness and others on the steps of the verandah of a house where a justice's court had been held that day, and was whittling with his knife; that while there, Ingram came by and said he wanted to talk to Coleman, or have a word with him, and requested Coleman to go with him. They walked off together, and a few minutes afterwards witness heard the report of the gun, and went to the place it proceeded from, and found Coleman had been shot. On cross-examination, counsel proposed to show by witness, "that on the day of the shooting, immediately after the shooting, that fifteen or twenty colored men marched in procession in Childersburg, and made demonstrations of hostility." The State objected to this evidence, because the facts proposed to be proved, occurred after the shooting. The court sustained the objection. Counsel for defense stated, that the evidence was offered in connection with other evidence to be offered, that in the forenoon of the same day, fifteen or twenty colored men had marched in procession in Childersburg, and made demonstrations of hostility. The State renewed the objection to this evidence, the court sustained the objection, and defendant excepted. The evidence of J. B. Green, who was called for the defendant, showed that Ingram, who resided on witness' farm, had used the gun with which he had killed Coleman, for the purpose of guarding five colored persons, who were in custody, charged with stealing cotton; that at the time of the shooting, Ingram wore a coat which he had bought from the witness about a week before, and when, about ten minutes after the shooting, he came to witness' store and delivered the gun, there was a cut or hole in the breast of the coat; that he was acquainted with the general character of the defendant in the neighborhood of Childersburg for peace and quietude, at and before the time, and that his character was good. Counsel for the State asked the witness, on cross-examination, "if he had not been informed that defendant had killed a man in the State of Georgia." The defendant objected to this question, but the court overruled the objection, and defendant excepted.

The witness answered, that he "had been informed that defendant had killed a man in the State of Georgia."

Joshua Oden testified that on the day of the killing, Ingram and another person had, at his request, gone with him and arrested some colored people, who were charged with stealing cotton. These people were placed in Ingram's custody as guard, by the justice before whom the charge against them was investigated; Ingram had a gun with him while acting as guard, and after the trial he came to the witness' house, and, after a few minutes conversation, started off saying that he was going to Green's store to give him his gun. In a few minutes he heard the report of the gun, and went to where it was fired and found that Coleman had been shot. The defendant proposed to prove by this witness that at the time Jack Coleman was killed, he was employed by the witness as a laborer, and that he knew no reason why he was absent from his work in Childersburg. The State objected to this evidence, the court sustained the objection, and defendant excepted.

The court charged the jury, that "the necessity of self-defense which will justify the taking of human life must be present, imperious, and impending, or so appear to the defendant; that to make out a case of justifiable homicide, committed in self-defense, the evidence must show that the difficulty was not provoked or encouraged by the defendant; that he was, or appeared to be, so menaced at the time as to create a reasonable apprehension of danger to his life, or grievous bodily harm, and that there was no other reasonable mode of escape from such impending evil."

The defendant excepted to these charges and requested the court, in writing, to charge the jury : "4. If the jury believe, from the evidence, that the deceased attacked the defendant in a violent manner, and that the defendant believed that the deceased intended to take his life, or inflict great bodily harm on him, the defendant had a right to shoot in self-defense, and if he killed the deceased in so doing, it was justifiable and self-defense. 5. It is not necessary that the appearances should be real; it is sufficient if the danger be apparent, such as to create in the mind of a reasonable man, the belief that it was necessary to take the life of the assailant, in order to save his own life, or prevent great bodily harm from being done him, and if, under such circumstances, the defendant took the life of the deceased, he is not guilty. 6. The law does not require the necessity for taking life to be one arising out of actual and imminent danger, in order to excuse the slayer, but he may act upon the belief arising from appearances, which give him reasonable cause

for it, that the danger is imminent, and apparent, although he may turn out to be mistaken. The guilt of the accused must depend on the circumstances as they appear to him, and he will not be held responsible for a knowledge of the facts, unless his ignorance of the facts arose from fault, or negligence, and if the circumstances be such as to create in the mind of a prudent man, the belief that there was a necessity to shoot the deceased, to save his own life, or prevent great bodily harm." The court refused to give any of these charges, and the defendant separately excepted to each refusal of each charge. The defendant was convicted of manslaughter in the first degree. The action of the court in the rulings on the evidence, and the giving and refusal of the charges, are assigned as error.

JOHN T. HEFLIN, for appellant.

H. C. TOMPKINS, Attorney-General, for the State.

STONE, J.—The testimony is that the load, with which the gun was charged, entered the left breast of the deceased, just above the region of the heart, inflicting a wound, into which the witness testified he could insert his three fingers. Deceased expressed the conviction he would die. We think there can be no doubt the declarations were made under a conviction of impending death.—*Faire v. The State*, 58 Ala. 74, and authorities cited. Part of the declaration of the deceased was in reply to a question asked him. This precise question has been several times before the English courts, and it was ruled that the fact that the declaration was made in reply to an inquiry did not render its admission illegal. Sharswood's Russ. on Crimes, 3 vol. 262–4; *Moore v. The State*, 12 Ala. 764; *McHugh v. The State*, 31 Ala. 317.

We are unable to perceive any principle which would justify the admission of evidence that "immediately after the shooting, fifteen or twenty colored men marched in procession in Childersburg, and made demonstrations of hostility." This could not possibly shed any light on the factum or intent of a transaction then passed.

Much latitude is allowed in the cross-examination of witnesses, and much must be left to the enlightened discretion of the court. No uniform, universal rule can be laid down. Much wider liberty of cross-examination is permissible, when the witness betrays partisanship, or partiality, than when he narrates the facts with prompt indifference, whether they favor the one side or the other. Hence, it must be a strong case to justify reversal, for too great latitude allowed in

cross-examination.—1 Greenl. Ev. § 449; *Stoudenmeyer v. Williamson*, 29 Ala. 558; *In re Carmichael*, 36 Ala. 514. A witness had sworn he knew the general character of the prisoner for peace and quietude in his neighborhood, and that it was good. On cross-examination he was asked if he had not heard that the defendant had killed a man in the State of Georgia. He was allowed to answer this question against the objection and exception of defendant. In 1 Best. on Ev. § 261, is the following paragraph: "In *R. v. Wood*, (5 Jurist, 225), the prisoner, who was indicted for a highway robbery, called a witness, who deposed to having known him for years, during which time he had, as witness said, borne a good character. On cross-examination it was proposed to ask the witness whether he had not heard that the prisoner was suspected of having committed a robbery, which had taken place in the neighborhood some years before. This was objected to as raising a collateral issue; but Parke, B., overruled the objection, saying, 'The question is not whether the prisoner was guilty of that robbery, but whether he was suspected of having been implicated in it.' A man's character is made up of a number of small circumstances, of which his being suspected of misconduct is one." The question was allowed, and the prisoner convicted. We approve this principle and the reason given for it, and hold that the Circuit Court did not err in receiving this evidence. In estimating character, the shadings as well as the brighter hues should be considered. They all go to make up character—reputation—the estimation in which the person is held. But it is only character, and not the particulars or details of independent acts, which can be inquired into.

The presence of deceased in Childersburg on that day, away from the place he was hired to labor, was, of itself, an immaterial circumstance in this trial.

In the two charges given, the Circuit Court only followed the law as declared in many rulings of this court.—*Judge v. The State*, 58 Ala. 406; *Mitchell v. The State*, 60 Ala. 26; *Ex parte* Brown, in manuscript.

Charges numbered 4 and 5 asked, ignore entirely the question of any other safe mode of escape. Human life is not taken with impunity, if the slayer provoked the difficulty, or failed to retire from it when he could have done so without endangering his life, or exposing himself to grievous bodily harm. When the accused stepped back, so as to afford him space to level his gun, he had placed the deceased at such a disadvantage, as that any attempt at aggression by the latter could have been easily averted. It is not shown that the deceased made any movement forward, or attempted to do

[Vines v. The State.]

so ; nor is it shown that he raised his arm from its pendent position. The only eye-witness of the homicide fails to state any thing of the kind. One having a loaded gun pointed at another, who is not advancing, can not be in present imminent peril of life or limb, even though that other have an open knife in his hand. The 6th charge asked is involved and calculated to mislead, if, indeed, it is not abstract.—*Cross v. The State*, 63 Ala. 40 ; *McNeezer v. The State, Id.*

Affirmed.