[DeArman v. The State.]

# DeArman v. The State.

### Indictment for Murder.

1. *Murder; conviction of murder in second degree an acquittal of murder in the first degree.*—A conviction of murder in the second degree is an acquittal of murder in the first degree; and, on appeal from the judgment of conviction in such case, this court will not consider the rulings of the primary court on questions relating to murder in the first degree, as, on a second trial, after reversal and remandment, all distinction between the degrees will be wholly immaterial.

2. *Same; failure of court to instruct the jury as to constituents of manslaughter; when free from error.*—On the trial of a defendant for murder, the failure of the primary court to instruct the jury as to the constituents of manslaughter in its general charge is not an error of which he can complain on appeal. If he deemed the instructions not full enough on any point, he should have asked specific instructions; and failing to do so, this court can not consider the question.

3. *Same.*—The failure of the primary court to so charge is free from error in this case for the additional reason, that the bill of exceptions purports to set out all the evidence, and contains no evidence tending to show that the offense, if any was committed, was, or could be manslaughter; the defendant being, under the evidence, either guilty of murder, or justifiable in the commission of the homicide under the law of self-defense.

4. *Homicide; self-defense.*—If a defendant indicted for murder did not provoke, or bring on the difficulty, but approached the deceased in an orderly and peaceful manner, and the deceased replied angrily and insultingly, advanced towards him, and placed his hand upon, or in the direction of his pistol pocket in such manner as to indicate to a reasonable mind that his purpose was to draw and fire, the defendant was authorized to anticipate him and fire first.

5. *Same.*—The rule in such case would not be varied, if it should turn out that the deceased was in fact unarmed, as the law of self-preservation did not require the defendant to wait until the weapon was presented, ready for deadly execution; but he had the right to act on the reasonable appearance of things. The danger, however, must have been real, or so manifestly apparent as to create a reasonable belief of present impending peril to life or limb; and the defendant must not have been instrumental in provoking or bringing it on.

6. *Same; when defendant not required to retreat.*—If the accused, with no intention of bringing on a difficulty, approached the deceased in a peaceable manner, and the deceased made the first hostile demonstration, by drawing, or attempting to draw a weapon, or by appearing to do so, the appearances coming within the rule declared above; and if the accused was in such proximity to the deceased as to render it hazardous to attempt flight; or if the assault was made with a deadly weapon, and was open and direct, and in perilous proximity; then the law would not require the accused to endanger his safety by attempted flight.

7. *When plea of self-defense is unavailing.*—But if the accused approached the deceased for the purpose of bringing on a difficulty with him, or had previously formed the design of taking his life, the plea of self-defense would be unavailing.

[DeArman v. The State.]

8. *Malice presumed from use of deadly weapon; burden of proof.*—The law presumes malice from the use of a deadly weapon, and casts on the defendant the *onus* of repelling the presumption, unless the evidence which proves the killing also shows that it was done without malice; "in other words, the burden of proving that a homicide was committed in self-defense rests on the defendant, unless it can be deduced from the facts and circumstances which prove the killing."

9. *Same.*—But if the testimony which proves the homicide, proves also its excuse or justification, then the burden is not shifted, and the defendant need introduce no proof.

10. *Homicide; general character of deceased for violence; degrees in.* Where on the trial of a defendant indicted for murder a witness examined on his behalf had testified that he knew the general character of the deceased for peace, and that, outside of his friends, he was regarded as a turbulent and dangerous man, it is error for the court to require the defendant, on motion of the State, to incorporate in a question propounded by him to the witness touching the deceased's general character for violence, the words "blood-thirsty," "quarrelsome," turbulent," "revengeful" and "dangerous." There are degrees in a quarrelsome or turbulent character; and, the proper predicate of knowledge being laid, the defendant should be free to ask such legal questions as he may elect to ask.

11. *Cross-examination of witness as to general character; what questions permissible.*—As character manifests itself by the manner in which one is esteemed, spoken of, or received in society, it is always permissible, on cross-examination of a witness testifying in reference thereto, to ascertain the extent of his information, the foundation of his opinion, or the *data* from which he draws his conclusion; and hence, on the trial of a defendant indicted for murder, in which the general character of the deceased for peace was an issue, it is error for the court to refuse to allow the defendant, on cross-examination of a witness examined by the State, who had testified that the deceased's general character for peace and quiet was good, to ask the witness whether he had not heard of certain enumerated acts of violence done by the deceased.

12. *Violent or blood-thirsty character of deceased; when material.*—When it is doubtful who was the aggressor, the known violent or blood-thirsty character of the deceased is a material matter to be considered by the jury, as more prompt and decisive measures of defense are justifiable against such an assailant. But this principle is confined to defensive measures; and it furnishes no excuse or palliation for aggressive action, nor when the difficulty is brought on, or sought by the accused.

13. *Confession; admissibility of.*—Held, under the facts shown by the evidence in this case, that a confession made by the defendant to an officer who had him in his custody, was voluntary and admissible.

14. *Self-defense; when previous threats by deceased may be considered in aid of.*—While previous threats do not make out the plea of self-defense, but there must be an actual or apparent present, impending peril to life or limb, either so menacing as to render any attempt to escape an increase of the peril, or such peril as can not reasonably be otherwise avoided, before life can be taken even by one who is without fault himself; yet, such threats, if proved, and known to the defendant, should be weighed by the jury, with other acts indicating hostility, in determning whether the fatal act was done under the reasonable and honest conviction, that its perpetration was then and there necessary to save the accused from the loss of his life, or from suffering great bodily harm.

APPEAL from Calhoun Circuit Court.

Tried before Hon. LeRoy F. Box.

John A. DeArman, the defendant in the court below, was indicted for the murder of Seaborn J. Crook, and was tried

[DeArman v. The State.]

and convicted of murder in the second degree, and sentenced to the penitentiary for the term of twelve years. On the trial many witnesses were examined, both for the prosecution and the defendant, whose testimony is set out *in extenso* in the bill of exceptions. It was not controverted on the trial that on or about 16th August, 1881, early in the morning, the defendant killed the deceased, shooting him with a double-barrel shot-gun, the deceased being at the time on the porch of the Jacksonville Hotel, in the town of Jacksonville, in said county, and the defendant sitting on his horse, on or near the sidewalk, with his gun lying across the saddle in front of him. Nor does it seem to have been controverted, that just prior to the killing the deceased came out of the store of one Hammond, about twenty-five feet from the door of the hotel, having three breach-loading Springfield rifles, went directly to the hotel, entered the hall, the door being the entire width of the hall and open, and placed the rifles against the wall of the hall near the door; that while standing there, and about one or two minutes after he had so placed the rifles, the defendant rode up to the sidewalk immediately in front of the hall door, and spoke to the deceased. Nor does it appear to have been controverted that when the deceased came out of Hammond's store and started in the direction of the hotel, the defendant was sitting on his horse in front of a saloon, in sight of the store, and saw the deceased when he left the store, and when he entered the hotel. When the defendant rode up to the hotel he had "swung around him" a hunting horn, and was followed by two dogs. The deceased had on a long "duster" at the time he was killed, and it appears that he was marshal of the town of Jacksonville.

There is, however, a conflict in the evidence as to the circumstances immediately preceding and attending the killing—as to what was then said and done by both parties, and their demeanor towards each other. The evidence for the State tended to show that when the defendant rode up in front of the hotel, he addressed the deceased, who was standing near the door, where he had placed the rifles, with his back to the defendant, saying, "Seab, can you blow a horn"; or, as stated by another witness, "Can I," or "can you blow a horn"; that the deceased then looked back over his shoulder, not turning his body, and replied, "Yes"; that the defendant then "rode round on the sidewalk" and said, "Won't you go hunting with me to-day? You said you would yesterday"; that when this question was asked, the deceased turned, and faced defendant, and took one step towards him (or, as stated by another witness, "Crook walked out two or more steps towards defendant as they talked";) that as he stepped towards defendant he said, "No, judge, I can't go to-day"; and as soon as the deceased had
23

[DeArman v. The State.]

said this the defendant shot him, he then being about two and a half or three feet from the muzzle of the defendant's gun when it fired; that at the time the gun fired, its position, in front of defendant, was not changed, except that the muzzle was slightly lowered; that the defendant cocked the gun after the conversation began; that at the time of the killing, and during the conversation, the deceased had only a stick in his hand, which he did not offer or attempt to use, one end of it being in his hand, and the other on the floor; that the defendant made no hostile demonstration whatever towards the defendant, and was not armed; and that both the deceased and the defendant "spoke mildly and pleasantly," and no change on the face of either of them was discerned prior to the shooting, indicating anger, or other bad feeling. The evidence for the State further tended to show that as the gun fired, the defendant was thrown from his horse, it having become frightened; that he immediately got up, came to the place where the dead body of the deceased was lying, and said: "I came to kill him, and," with an oath, "I've done it"; and that he then remounted his horse and rode off in the direction of his home. So far as disclosed by the record, the deceased and defendant had not met that morning prior to their meeting at the hotel.

The defendant read in evidence the deposition of one Coleman, whose testimony in regard to the killing was as follows: "I saw the shooting. Defendant was some distance from the hotel, and saw Crook going towards the hotel with three guns, and he said he would go and see him about the hunt they were talking about. As he approached Crook, he said: 'Are you going to take that hunt with me to-day?' Crook's reply was: 'No, by God, I am not.' Defendant then asked him if he could blow his horn for his dogs, and Crook said he could not, with some other words that I did not understand, at the same time running his hands in his pockets. I turned my head away, and heard the report of a gun, and I instantly looked back and saw defendant getting up—his horse having thrown him—and Crook lying dead. . . . Crook had a common sized stick in his hand, when the difficulty commenced, but I do not know in which hand he had it. . . . I am sure that defendant asked Crook for permission to blow his horn, and Crook answered in an ordinary tone of voice, but short, and had a stick in his hand, and was approaching defendant, and was in four or five feet of him when the gun fired. It was from thirty to sixty seconds from Crook's answer till the gun fired." The testimony of this witness as to the conversation between the defendant and deceased, just prior to the killing, is corroborated by the testimony of other witnesses exam-

[DeArman v. The State.]

ined by the defendant.    Another witness for the defendant testified, among other things, as follows: "When defendant rode up Crook advanced towards him.    I heard each of them say something, but I could not understand what they said    When Crook advanced on defendant, his right hand was on his hip, and under his coat, and the gun fired almost immediately after he started."    Another witness for the defendant testified, among other things, that about the time Crook had put the rifles against the wall in the hall of the hotel, "the defendant rode up and spoke to him.    He said something about going hunting, and Crook answered, *no*.    Defendant then said something about a horn, and as Crook answered him, he (Crook) advanced towards defendant, and threw his right hand behind him like he was going to get something, and then the gun fired and both fell."    The defendant also examined one Brown as a witness who testified, in substance, among other things, that he saw the deceased about sunrise of the morning of the killing, and heard him say that he would kill defendant, if he came to town that day; and that shortly afterwards, and a few minutes before the killing, witness told defendant what the deceased had said, and "told him he had better look out."    Testimony was also offered by the defendant tending to show that the deceased had a pistol in his pocket, and that he had his hand on it, when he was killed.    It was not shown that the deceased made any effort to use any one of the rifles which he had carried to the hotel.

The State was allowed, against defendant's objection, to prove by one Lee, a deputy sheriff, a confession made to him by the defendant, upon, in substance, the following preliminary proof: When the defendant rode off in the direction of his home after killing Crook, several armed persons followed for the purpose of arresting him.    Three of the number found him in a field near his house, about two miles from Jacksonville, with his gun, and drew their guns on him.    About this time the witness Lee and others came up, and the defendant said to him: "You are an officer and a gentleman.    Don't let these men hurt me."    He was arrested by Lee without resistance, and carried back to Jacksonville, he and Lee riding in a buggy, with some of the crowd in the rear and some in front.    After going a short distance the witness said to the defendant: "I am sorry you have got into trouble;" and thereupon the defendant made the confession which was as follows: "The defendant said he had done wrong; that he expected they would hang him or penitentiary him, and that he did not care a d—n which; that he did not intend to employ a lawyer; and that he had consulted his family about it *last night*, and it was all right." He also said in the same conversation that "Seab Crook [the

deceased] had beat him up and broke two of his ribs, and that he was an old man." It was also shown that no threats or inducements were made against, or offered to the defendant before he made the confession. To the ruling of the court on the admissibility of the confession the defendant excepted.

The defendant also reserved exceptions to the refusal of the court to allow one of his witnesses to answer the following questions: (1) "State whether or not you saw Crook have defendant in custody on Monday evening before the killing;" (2) "Did you see Crook strike DeArman on that Monday evening;" (3) "Did you see Crook kick DeArman into the calaboose that evening;" (4) "Was there or not for many years a family feud between Crook's family" and that of the defendant. Numerous other exceptions were reserved by the defendant to the rulings of the court on questions of evidence. The facts touching those discussed by this court are sufficiently stated in the opinion.

Several exceptions were reserved by the defendant to parts of the general charge of the court; and among them were the following: 6. "If, under these rules, you find from the evidence that the homicide was not in self-defense, then evidence —if there be such—of threats previously made by Crook against the defendant, and evidence of Crook's bad character for peace and quiet can afford no palliation or extenuation of the offense." 7. In substance, that if the jury find that the killing was in self-defense, or if from the evidence they have a reasonable doubt as to whether or not the killing was in self-defense, they should look, in connection with the other evidence, to the evidence in relation to Crook's bad character as a dangerous, bloodthirsty, revengeful, overbearing, reckless man, or his general character for peace and good order, and to any evidence of threats previously made by Crook, in determining the real or apparent danger to DeArman, impending at the time of the killing, and the real or apparent necessity for slaying Crook, in order to save himself from death or grievous bodily harm. The general charge fails to instruct the jury as to the constituents of manslaughter.

The defendant also duly reserved exceptions to the rulings of the court in refusing to give four charges requested by him. The opinion only renders it necessary to set out the first of these charges, which is as follows: "The danger that will excuse one for killing another need not be real or actual. It may now be known that all the appearances of danger were false, and Crook never intended to do defendant any harm, and that he did not have a pistol; yet, if the jury believe from all the evidence in this case, that the appearances of danger surrounding the defendant at the time were such as to produce a reasonable

[DeArman v. The State.]

belief in the mind of the defendant, that his life was in danger, or that he was about to suffer great bodily harm; and that there was no other reasonable means at the time open to the defendant to avoid the danger, but by taking Crook's life—the defendant being without fault at the time—the law holds him harmless, and the jury must acquit him, although Crook may have had no pistol." The second charge requested by the defendant, and refused, also embodied instructions on the doctrine of self-defense.

At the request of the State, the court charged the jury, *inter alia*, as follows: 1. "When life is taken by the intentional use of a deadly weapon, the law presumes that the killing was malicious, unless the evidence establishing the killing also shows circumstances of justification, mitigation, or excuse, which overturn that presumption." 4. "Where the question of self-defense arises from the evidence, the jury can not consider evidence of threats made against the defendant by the deceased prior to the killing." 6. "When a defendant sets up self-defense in justification or excuse of a killing, the burden of proof is upon him to show to the jury by the evidence, that there was a present, impending danger, real or apparent, to life or limb, or of grievous bodily harm, from which there was no other probable means of escape; and the slayer must not have been the aggressor." 8. "If the evidence fails to show that, at the time of the shooting, Crook made any hostile demonstration towards DeArman, then the jury can not consider any evidence of threats made by Crook against DeArman, or evidence of Crook's bad character." To the giving of these charges the defendant separately excepted.

The rulings above noted are here, among others, assigned as error.

DENSON & DISQUE, and PARSONS & PARSONS, for the appellant. (1) Although the defendant was convicted of murder in the second degree, yet an erroneous charge upon murder in the first degree will operate a reversal. Error without injury does not apply in Alabama in cases of this magnitude. *Mitchell v. State*, 60 Ala. 28–35. (2) The court erred in refusing to give the first written charge of the defendant.—*Cross v. State*, 63 Ala. 40; *Jordan v. State*, 11 Tex. (Ct. of Ap.) 435. (3) The court erred in refusing to give the second charge asked by defendant.—*Bohannon v. State*, 8 Bush. 482; *State v. Kennedy*, 7 Nev. 374; *Foster v. State*, 11 Tex. (Ct. of Ap.) 105; *Jordan v. State, Ib.* 435; *Kendall v. State*, 8 Tex. (Ct. of Ap.) 577; *Erwin v. State*, 23 Amer. Rep. 733; *Runyan v. State*, 26 Amer. Rep. 52; Roscoe's Cr. Ev. 767, *et seq; Eiland v. State*, 52 Ala. 332. (4) The presumption of malice from the use of a deadly weapon is derived

[DeArman v. The State.]

from the common law; and hence, murder in the second degree in Alabama being murder at common law, the grade of murder that is presumed from the use of such weapon is murder in the second degree. The law never presumes a killing murder in the first degree; but the presumption that is indulged from the act of killing is murder in the second degree.— *Willis v. Commonwealth*, 32 Gratt. 929; *Schlencker v. State*, 9 Neb. 303; *Preuit v. State*, 5 Neb. 377; *Milton v. State*, 6 Neb. 136; Cases on Self-Defence, 511; *State v. Evans*, 65 Mo. 574; *State v. Gassert*, 65 Mo. 352.   (5)   The court erred in not charging the law of manslaughter.   There was sufficient evidence to authorize such a charge.   This being true, it was then the imperative duty of the court to charge on the law of manslaughter.   The court, in such case, has no right to assume there was malice; this is peculiarly a question for the jury.—3 Wharton's Crim. Law, § 3163; *State v. Judge*, 58 Ala. 407; *State v. Banks*, 73 Mo. 592; *State v. Branstetter*, 65 Mo. 149; *Lane v. Commonwealth*, 59 Pa. St. 371.   (6)   There was manifest error in refusing to allow the defendant to ask the witnesses, Bush and others, examined by the State for the purpose of showing that the deceased had a good character for peace and quiet, on cross-examination, the several questions propounded to them, for the purpose of testing their knowledge of such character.—*Ingram v. State*, 67 Ala. 67; 1 Best on Ev. § 261; 22 Ala. 39.   (7) The court erred in admitting the confession testified to by the witness Lee.—*Brister v. State*, 26 Ala. 107; *Aiken v. State*, 35 Ala. 399; *Young & Griffin v. State*, 68 Ala. 569.   (8)   The court erred in requiring the defendant to incorporate into the question propounded to Thomas Pelham, as to the character of the deceased for violence, the terms "quarrelsome," "revengeful," "turbulent," and "dangerous."   A man may be of bad character for peace and quiet, generally known to be so; and yet, he may not be generally known as a revengeful, quarrelsome, turbulent, and dangerous man.   (9)   Other points raised by the record, but not passed on by this court, discussed.

H. C. TOMPKINS, Attorney-General for the State.   (No brief came to the hands of the reporter.)

STONE, J.—The defendant was indicted for murder, and convicted of murder in the second degree.   This was an acquittal of murder in the first degree, and the prisoner can not again be tried for that highest grade of felonious homicide. In *Mitchell v. State*, 60 Ala. 26, we defined the constituents of murder in the first degree, and drew the distinction between that and murder in the second degree.   We adhere to what we there said, and will not repeat it.   We will not consider any

questions raised by this record, relating to murder in the first degree. In any future trial of this case, all distinction between murder in the first degree and murder in the second degree will be wholly immaterial and irrelevant. If the defendant is guilty of murder at common law, as declared in our rulings thereon, and if it is proven with that measure of proof the law exacts in criminal cases, then the jury should find him guilty of murder in the second degree, for they can go no higher. In such finding, they must fix the duration of imprisonment in the penitentiary, not less than ten years.

It is objected in behalf of the accused, that the Circuit Court should have instructed the jury as to the constituents of manslaughter, and that the failure to do so is an error of which appellant can complain. There are two answers to this: First, if the accused deemed the instructions not full enough on any point, he should have asked specific instructions; and failing to do so, we can not consider the question; second, the bill of exceptions purports to set out all the evidence, and we fail to discover any testimony tending to show the offense, if any was committed, was, or could be, manslaughter. The defendant was either guilty of murder, or he slew the deceased in self-defense. One phase of the testimony tends to prove a most causeless murder. If the jury are convinced beyond all reasonable doubt, that this version is the true one, then the defendant should be pronounced guilty of murder. On the other hand, there is other testimony tending to show that the first hostile demonstration was made by the deceased. If the jury believe the defendant did not provoke, or bring on the difficulty; that he approached the piazza, on which deceased was standing, in an orderly and peaceful manner; that deceased replied to him angrily or insultingly, advanced towards him, and placed his hand upon, or in the direction of his pistol-pocket, in such manner as to indicate to a reasonable mind that his purpose was to draw and fire; then the defendant was authorized to anticipate him, and fire first; and the rule would not be varied, if it should turn out the deceased was in fact unarmed. The rule of self-defense in such cases is, that persons may and must act on the reasonable appearance of things; for the law of self-preservation would be very incomplete, if persons thus menaced were required to wait until the weapon was presented, ready for deadly execution. The danger, however, must be real, or so manifestly apparent, as to create a reasonable belief of present impending peril to life or limb; and the accused must not have been instrumental in provoking or bringing it on.—*Ingram v. State*, 67 Ala. 67; *Leonard v. State*, 66 Ala. 461; *Cross v. State*, 63 Ala. 40. So, if the accused approached the deceased for the purpose of bringing on a difficulty with him, or had previously

formed the design of taking his life, then the plea of self-defense is unavailing. If the accused, with no intention of bringing on a difficulty, approached the deceased in a peaceable manner, and the deceased made the first hostile demonstration, by drawing, or attempting to draw a weapon, or by appearing to do so, under the rules declared above; and if the accused was in such proximity to the deceased as to render it hazardous to attempt flight; or if the assault was with a deadly weapon, and was open and direct, and in perilous proximity, then the law would not require the accused to endanger his safety by attempted flight.—*Storey v. State*, ante p. 329. The law is a reasonable master, and has equal regard for every human life under its jurisdiction. It recognizes love of life as a natural and legitimate sentiment; and while it can not be moulded or controlled by notions of chivalry, it permits every one who is without fault, and who has adopted every reasonably safe expedient to avert the necessity, to take the life of his assailant, rather than to lose his own. The Divine law does not require us to love our neighbor better than ourselves.

In *Hadley v. State*, 55 Ala. 31, we said: "The law presumes malice from the use of a deadly weapon, and casts on the defendant the *onus* of repelling the presumption, unless the evidence which proves the killing shows also that it was done without malice." In other words, the burden of proving that a homicide was committed in self-defense rests on the defendant, unless it can be deduced from the facts and circumstances which prove the killing. We adhere to that doctrine.

Thomas Pelham testified for defendant that the deceased, Crook, outside of his friends, was regarded as a turbulent and dangerous man. He had testified he knew Crook's general character for peace. The court thereupon, on motion of the prosecution, "required the defendant to incorporate in the question as to Crook's character the words "blood-thirsty," "quarrelsome," "turbulent," "revengeful," and "dangerous." We are not sure we understand this exception. If the court instructed the counsel that he could not interrogate the witness as to Crook's character for violence, unless he asked him whether or not he had the character of being "blood-thirsty, quarrelsome, turbulent, revengeful and dangerous," then the rule was too exacting. A man may have a bad character for peacefulness, without possessing all the vicious qualities enumerated. There are degrees in a quarrelsome, or turbulent character, and, the proper predicate of knowledge being laid, counsel should be free to ask such legal questions as he may elect to ask.

W. F. Bush and others, rebutting witnesses for the State, had testified that Crook's character for peace and quiet was good. They were then asked whether they had not heard of

several enumerated acts. of violence done by Crook. The wit-
nesses were not allowed to answer these questions. In this the
Circuit Court erred. Character, in this connection, is the esti-
mate which the public places on the person, the subject of the
inquiry ; his reputation. When a witness is called to testify in
regard to it, he must not speak of or from his individual knowl-
edge of the acts or conduct of the person inquired about. His
reputation or standing, whether good or bad, is the matter to
be deposed to. Character is the estimation in which one is held
by the public who know his standing. Thus, one may have the
reputation of being peaceable or quarrelsome, harmless or
dangerous and blood-thirsty, truthful or the contrary, honest or
dishonest. A witness, having knowledge of this estimate in
which such person is held by the public, may testify as to his
reputation or character, although he may have no personal
knowledge that he is peaceable, truthful, honest, or the contrary.
On cross-examination a witness as to character may be interro-
gated as to the foundation of his opinion. And, as character
manifests itself by the manner in which one is esteemed,
spoken of, or received in society, it is always permissible, on
cross-examination, to ascertain the extent of the witness' infor-
mation, and the data from which he draws his conclusion. The
weight of such testimony must depend largely on the reason-
ableness of the conclusion the witness draws from the premises
as he may depose to them.—*Ingram v. State*, 67 Ala. 67.

As we have heretofore said, there was some testimony tend-
ing to show that immediately preceding the killing Crook made
a hostile demonstration by moving towards the defendant, and
moving his right hand towards his hip pocket. If the move-
ment forward indicated a hostile purpose, and if the jury be-
lieve, as fact, that Crook did first make a movement as if to
draw a pistol, or if the testimony generates a reasonable doubt
whether or not Crook first made such movement as if to draw,
then the defendant should not be convicted of murder, unless
they find he had previously made up his mind to take Crook's
life, or that he sought or provoked the altercation. Previously
formed design on defendant's part, or any step taken to bring
on the difficulty, if found to exist, will deny to him the right to
the plea of self-defense. In this connection, the testimony of-
fered to prove the violent or dangerous character of the de-
ceased, if believed, should be considered. On all doubtful
questions as to who was the aggressor, the violent or blood-
thirsty character of the deceased, if such be his character, en-
ters into the account. More prompt and decisive measures of
defense are justified, when the assailant is of known violent and
blood-thirsty nature. But this principle is confined to defensive
measures. It furnishes no excuse or palliation for aggressive

[DeArman v. The State.]

action, nor when the difficulty is brought on, or sought by the accused. The principles we have just announced have reference to the clauses of the general charge, which are made the 6th and 7th exceptions of the defendant. They should be modified according to these views. Let us not be misunderstood. If the accused had the previously formed design to take Crook's life, and carried it into effect pursuant thereto, or if he provoked the difficulty, then Crook's character for violence, no matter how clearly proved, will avail him nothing.

In what we have said, we have declared the law in reference to both phases of the testimony. This it is the duty of the court to do, no matter what he may conceive to be the relative weight of the testimony on the opposing sides. With that he has nothing to do. The jury alone pronounce on the weight of testimony, and under their solemn oaths render their verdict, according to their findings of fact, and the law as declared to them by the court.

We decline to consider the exception numbered 1 to the general charge, but leave that question open, as no inquiry of murder in the first degree will arise on another trial. It affirms that murder, intentionally committed pursuant to a form design to take life, is the equivalent of a willful, deliberate, malicious and premeditated killing, and falls within the first degree. We are not prepared to say this is error, but we need not decide it. See *Mitchell v. State, supra.* It would clearly be murder, and we do not understand that to be controverted. That is enough for this case.

We do not think the Circuit Court erred in admitting the confessions testified to have been made to E. G. Lee, while he was returning with the prisoner to Jacksonville after the arrest. No threats, promises, or hostile demonstration was made, at all calculated to induce the confessions, made as they were testified to have been. The prisoner evidently looked upon Lee, who had him in custody, as his protector, and we fail to discover in the circumstances any evidence of threats made, or inducements held out, which could, in the slightest degree, induce the confession alleged to have been made. According to the evidence, the confession was voluntary.

The first charge asked by defendant asserts a correct proposition of law, and should have been given. The second charge asked contains, as one of its postulates, that "Crook advanced in the direction of the defendant with a gun or guns." The testimony tends to show the guns were standing in the hall of the hotel, and there is no testimony that Crook then had a gun or guns. This charge was rightly refused for this reason, if for no other.—*Tyree v. Lyon,* 67 Ala. 1; 1 Brick. Dig. 338, § 41.

[Ex parte The State of Alabama.]

Defendant's charges 3 and 4 relate to murder in the first degree, and need not be considered.

The 4th charge given at the instance of the State was misleading, and should not have been given. True, previous threats do not make out the plea of self-defense. There must be an actual or apparent present, impending peril to life or limb, either so menacing as to render any attempt at escape but an increase of the peril, or such peril as can not reasonably be otherwise avoided, before life can be taken, even by one who is without fault in the premises. But previous threats, if proved, and known to the actor, should be weighed by the jury, in determining whether the accused acted under the reasonable conviction of present, imminent peril. Of themselves, threats previously made are insufficient; but they should be weighed with other acts indicating hostility, in determining whether the fatal act was done under the reasonable and honest conviction that its perpetration was, then and there, necessary to save the accused from the loss of his life, or from suffering grievous bodily harm. But this doctrine must be taken with what is said above. If the accused sought or provoked the difficulty, or if he availed himself of it as a pretext for executing a design previously formed to commit the homicide, then this would not be self-defense, but murder. The 8th charge given declares the correct rule as to when previous threats are to exert no influence with the jury.

The 6th charge given omits one qualifying clause. True, self-defense, as a rule, must be proved by the defendant. In other words, the *onus* is on him to make it good. But the rule has an exception. If the testimony which proves the homicide, proves also its excuse or justification, then the burden is not shifted, and the defendant need introduce no proof.

There are many exceptions in this case, and every step in the contest seems to have been severly combatted. We have found no errors, save those above pointed out.

Reversed and remanded. Let the accused remain in custody, until discharged by due course of law.