PULLIAM *et al.* vs. CANTRELL.

1. There is sufficient evidence to sustain the verdict in this case.
2. The discretion of the presiding judge in permitting the witness to explain his testimony is very broad. Where the examination of a witness continued during a portion of two days, it was proper, on the second day, to allow him to explain certain testimony given by him on the first. The jury may note the correction or contradiction and weigh it all as part of his manner and credibility on the stand.
3. Where the character of a witness had been sustained generally, it was proper to refuse to allow another witness to be asked if the person whose character was being considered had not been found a defaulter of public funds, or if the witness had never heard that he had been so found. A conviction of embezzling public funds could not be so proved.
(*a.*) Besides, the facts sought to be proved were made to appear in other portions of the testimony, and the ruling did no harm.
4. Where an attorney received a note for collection and gave a reciept therefor, which was delivered to another to indemnify him as a surety on the client's bond as a public officer, if another surety claimed to have an interest in the indemnity, it was necessary that he should at least intimate his claim to a part of it; otherwise, if the attorney collected the amount of the note and paid it over to the original client, with the consent of the surety holding the receipt, he would not be subject to rule in favor of the other surety.
5. The charge that, where two innocent parties are involved, that one who trusted the party doing the injury with the power to hurt, must suffer rather than the other, who was entrapped by the use of that power, is applicable to this case.
6. Under the facts of this case, there was no error in charging the three modes of impeaching a witness laid down in the code, and in stating that the general good character of a witness, if proved, might be considered to sustain the witness, by evidence as to the facts themselves, or by proof of general good character, having also charged as to conflicting testimony, and that all the testimony was for the consideration of the jury.
7. On a rule against an attorney, the verdict being in his favor, charges as to what amount of fee he might deduct from the collection, were immaterial.

January 18, 1887.

Practice in Superior Court. Witness. Charge of Court. Attorney and Client. Notice. Torts. Fraud. Before

Judge Fain.   Gordon Superior Court.   February Term, 1886.

Reported in the decision.

W. C. Glenn; O. N. Starr, for plaintiffs in error.

Dabney & Fouché; McCutchen & Shumate, for defendant.

Jackson, Chief Justice.

Samuel Pulliam and Joab Lewis brought a rule against W. J. Cantrell, an attorney at law, for money he had collected for J. H. Arthur, whose receipt on Cantrell Pulliam held by delivery from Arthur, and in which, it was alleged, Lewis, by an understanding with Arthur, and at the instance of Pulliam, became also interested.   Cantrell's defence was, that he paid all the money to Arthur with the consent of Pulliam, and that he knew nothing of Lewis's interest.   The jury found for Cantrell, and the presiding judge, approving the verdict, refused a new trial, and that refusal, on the ground therein laid, is assigned as error.

1. On both issues of fact, to-wit, whether Pulliam assented to the payments to Arthur after the delivery of the receipt to him, within Cantrell's knowledge of possession of it by Pulliam, and whether Cantrell knew of Lewis's interest in it, the testimony is conflicting, but enough to uphold the verdict when endorsed by the presiding judge. Errors assigned upon the ruling of the court are, therefore, the only matters for the consideration of this court.   These grounds are very numerous, but when analyzed may be much reduced.   They are rulings as to evidence and as to the charge.   But two points are made touching the evidence, one as to the admitting of it, and the other as to its rejection.

2. It is assigned as error that the court allowed the witness, Cantrell (the defendant), to explain his testimony

on the preceding day, while remaining on the stand the next day. The latitude within which a witness may explain his testimony is very wide. There is scarcely any limit to the discretion of the presiding judge about it. Up to the very close of the examination of the witness it is always proper to allow explanation, unless a witness on the other side has been discharged and is gone, whose testimony, if he were present, would be necessary to contradict the explanation, or in other kindred case. Most assuredly the witness, while on the stand before his testimony is closed, though protracted a week, may be and should be permitted to explain his testimony or to correct it, to bring out the whole truth, even to contradict, if, on reflection, he chooses to do so, as his refreshed memory may enable him. It is for the jury to note the correction and contradiction, and weigh it all as part of his manner and credibility on the stand. 14 *Ga.* 242, 251.

3. The complaint about the rejection of testimony is equally untenable as reason for a new trial. It is, that the court refused to allow the question by the plaintiff, when Arthur's character was sustained generally by the defendant, " He was found a defaulter of public funds to the amount of about nine thousand dollars, wasn't it, Doctor?" And also this question, "Did you ever hear that Arthur had been found a defaulter to the amount of nine thousand dollars ? "

The questions were properly disallowed because the effort was made to prove conviction of a crime by hearsay. The code lays down the rule in section 3874, " But the particular transactions or the opinions of single witnesses cannot be inquired of on either side, except upon cross-examination in seeking for the extent and foundation of the witness's knowledge." This was on cross-examination of the witness, but it was not to show the foundation or extent of his knowledge of the character of the witness impeached in a legal way. It was an effort to show the conviction of Arthur of the offence of embezzlement by

hearsay.   Conviction can be shown only by the record, and there it was in that court.   Besides, it was to draw out by the last question that fact of conviction by having heard anybody say so, not many, but any one person.   In addition to all this, his conviction was afterwards let in or it got in; for counsel again and again asked the sustaining witnesses question after question to know how it was possible they could  say one had good character and could be believed when he had committed such a crime and been convicted of it.   So that plaintiffs were not hurt.   Everybody knew of the conviction, yet many sustained him upon the idea that intent to steal was not in the man, and that he was legally, but not in their opinions morally, guilty.

4.  While exceptions to the charge are numerous, seemingly segments cut out of the  entire charge, the counsel for plaintiff stressed but one point on which he really relied.   That point is made as well in a refusal to charge as in the charge itself.   And that point does not affect Pulliam, but only Lewis.   In so far as it is sought to be made in the request, it is enough to say that it is not a written request before the charge, but oral during the charge. The point, however, is sufficiently made in exceptions to the charge, and we proceed to consider it.   The receipt was handed by Arthur to Pulliam, delivered to him only. Afterwards, according to the version of the plaintiffs, Pulliam got sorry for Lewis, who was a surety for Arthur, the defaulting officer with Pulliam, and took him in as a sharer of this receipt as collateral to repay the two should they suffer as sureties.   Thereupon Pulliam carried him to Arthur, and Arthur receiving the receipt—Cantrell's receipt as attorney—back, handed it to both.   Pulliam, however, again received it, and continued in possession. All this is denied by Arthur, but it is the version of the plaintiffs, strange as Pulliam's generosity, and the singular manipulation of the receipt by the three in passing and repassing the paper, may appear.   They insisted, moreover, that Cantrell knew all about this redelivery, and

the joint title to the receipt, which Cantrell denied. Under these facts and upon this issue, the court declined to ignore possession of the paper by Pulliam altogether, and did not charge exactly the oral request that "in other words, if it was his" (meaning Lewis, in part, doubtless) "and Cantrell knew it, something else besides possession of the receipt must be shown that Pulliam had authority to direct Lewis's interest;" but did repeatedly charge to the effect that the jury, if they believed that Lewis had an interest, and that Cantrell knew it, must look to all the facts and circumstances of the case, to see whether Pulliam was really acting for both in a common interest, a sort of partnership interest, and he honestly and *bona fide* paid the money to Arthur by Pulliam's direction, then he would be protected as against Lewis as well as Pulliam, Cantrell taking the burden of proof on himself. Indeed, in some parts of the charge the court went much further; and even in one charge excepted to, the court instructed the jury that, "If Pulliam could not recover, yet Lewis might recover his undivided half-interest, provided he gave an intimation to Cantrell that he claimed that independently, or Cantrell had notice that he had that undivided half-interest and that Pulliam did not control and direct."

Surely this extended the liability of Cantrell to the very verge of reason and common justice. He has notes to collect for a client and finds the receipt in possession of one of his sureties. He is instructed by him to pay the money to Arthur. He knows that Arthur is turning over property other than this receipt to protect his sureties. He knows that Pulliam and Lewis are engaged in negotiations for these indemnities, and he honestly and *bona fide* had the right to believe that, thus engaged in this joint effort to save themselves, Pulliam, having the note, is acting for Lewis, if Lewis has an interest, as well as himself, in directing the money paid to Arthur, and he pays it as directed, with full faith that this is the truth. Must not he have some intimation to the contrary from Lewis to be put

in contempt of court and made to pay over this money paid out under this direction? Must he not be informed by Lewis or Pulliam, or somebody, that Lewis has an undivided interest in the receipt, and that possession of it as of all personal property, if a receipt be as high as personal property even, does not give title to it in Pulliam? In the light of these facts, and all charges must be made in that light in all cases, we do not see that Lewis, in thus entrusting the only piece or fragment of title he had to this receipt in the hands of Pulliam, did not owe it to legal obligation as well as common justice to intimate some claim to some part of it to the man who, without it was sure to pay it to Pulliam or to whomever Pulliam directed it to be paid.

5. And this leads us to mention that the charge that where two innocent men are involved, that one who trusted the party injuring with the power to hurt, must suffer rather than the other, who was entrapped by the use of that power, is applicable here. The power that hurt is the receipt. It was entrusted, in plaintiff's version, to Pulliam, so far as Lewis's half is concerned. So if Lewis is hurt, his confidence in Pulliam did it; his trust to him caused it; whereas Cantrell had no hand in confiding or trusting the receipt to Pulliam, but if he has this money to pay again to Lewis after once paying to Arthur, he is badly hurt by the receipts being put in Pulliam's sole possession when he had no intimation of it. For if he did have an intimation, the court in the charge made him liable.

6. Nor do we see error in the charge concerning impeachment of witnesses, if we have not greatly misunderstood it. The court laid down the three modes of impeachment embodied in our code, section 3871, to-wit: "1st, by disproving the facts testified to by him; 2d, by proof of contradictory statements previously made by him as to matters relevant to his testimony and to the case; and 3d, by evidence as to general bad character." In this case, an attempt was made to impeach Arthur by statements

previously made, and in reply to this, testimony to his good character was introduced by authority of section 3875 of the code. It is true that proof was made also contradictory or adverse to his testimony, as it was to Cantrell's; and so was his testimony and Cantrell's contradictory to and adverse to Pulliam's and Lewis's, and so Cantrell's son sustained his father and Arthur, and other witnesses, in some particulars, sustained Lewis and Pulliam; and this is the case on all contested issues. But we do not understand that all these witnesses were impeached, or that an effort was made to impeach them. So, viewing the charge in the light of the facts, we do not think that the court misled the jury by telling them what were the modes of impeachment, and that the general good character of a witness, if proved, might be considered to sustain a witness by evidence as to the facts themselves, or they may sustain it by proof of general good character. He was then upon the point of evidence introduced pointing in the direction to impeach him, as his own language is; he had before explained the law in respect to contradictory facts where two witnesses differ, and had called attention to the support the facts a witness swore would receive from other witnesses to the same or similar facts, in whole or in part; and then passed on to the evidence pointing to impeachment, that is, by proof of previous statements outside the court-room. One or two sentences are somewhat confused, but even if the jury did misunderstand the charge, it could not have done much harm. For after all, as the court said to the jury, it is for them to look at all the testimony of all sorts, and believe those most worthy of belief in their judgment from all the facts and circumstances, so as to reach the truth. Why should not the opinion that the vicinage has of the general character of a witness, when legitimately admitted to the jury to sustain the character of a man attacked by previous statements made to other men as they remember and swear, also strengthen him when others swear on the stand differ-

ently from him? While his character could not be put in issue for the latter purpose, yet when put in and triumphantly sustained, what law will prevent the jury from considering such supporting evidence as strengthening his general testimony? At all events, we see in the confused charge, assailed as such by counsel—very acute and able counsel in this case in detecting any appearance of error,—no such error as should send the case back.

7. In respect to errors assigned on the charge touching the fees of Cantrell, it is unnecessary to consider them, because the verdict is that plaintiffs recover nothing; and if they get nothing, it does not hurt them how much fees Cantrell got out of a fund in which they had no interest, according to the verdict, or whether he got any.

Taking the case altogether, we think the verdict supported by plenty of evidence, and the jury and judge being all satisfied, and finding no error of law grave and hurtful enough to do harm, to say the least, we will not disturb the verdict.

Judgment affirmed.