## OZBURN v. THE STATE.

1. When, on the trial of a felony, several of the jury have been selected, and one of them becomes sick, it is not error to excuse him, and then proceed regularly to complete the panel to the

number of twelve; and this the court may do without summoning a physician to determine that the juror is sick.

2. On the trial of a murder case, the court was requested in writing to give in charge to the jury the sections of the code relating to the law of voluntary manslaughter and of justifiable homicide, and complied with the request as made except as to justifiable homicide; and it plainly appearing that in no view of the case the law of justifiable homicide was applicable, no error was committed.

3. When, on a trial for murder, the court failed to instruct the jury they could find the defendant guilty of voluntary manslaughter, and no error is assigned on such failure, either in the motion for a new trial or bill of exceptions, the question whether or not such failure was error is not before this court for review.

4. A witness who testifies to the good character of a defendant for peaceableness, and that he had never heard of defendant having a difficulty before, may be asked, on cross-examination, if he had never heard of defendant's shooting any one before, and if he had never heard of his shooting a man in another State.

5. On the trial of a murder case, counsel for the State may comment before the jury upon the propriety or impropriety of their recommending imprisonment for life as a punishment.

6. A specified portion of the court's charge concerning the defendant's statement being in the main correct, an exception to the same as a whole, not alleging any particular portion thereof to be erroneous, cannot be considered. In this case, there is nothing in the charge complained of requiring a new trial. In charging concerning statements made by defendants, courts should confine themselves to the language of the statute upon this subject, and not indulge in extended comments upon the effect to be given to such statements.

April 24, 1891.

Criminal law. Murder. Jurors. Practice. Charge of court. Manslaughter. Witness. Argument of counsel. Prisoner's statement. Before Judge RICHARD H. CLARK. Fulton superior court. September term, 1890.

Ozburn was indicted for murdering Bradley by shooting him with a pistol, and was found guilty. To the refusal of a new trial he excepted. His grounds for new trial are sufficiently stated in the opinion. The evidence for the State showed that the shooting was done in Bradley's store, no one besides him and the

defendant then being present; that the defendant was the smaller man of the two; that they were sitting down with some papers in their laps, and the defendant jumped up and shot Bradley, who was sitting in a chair when he shot, and who immediately went out of the store upon the sidewalk in front, and continued to retreat, moving backwards or sidewise towards the corner of the store as if to get out of the way, while the defendant, standing in the door, fired the pistol at him in quick succession, there being four or five shots in all and Bradley being six or seven paces distant; that the last shot was fired before he fell, and probably all the shots took effect, two wounds afterwards being found in his right arm, two in the front of his chest, one on his left shoulder, one on the side of his back just under the shoulder, and one in the abdomen; that he had nothing in his hands during the shooting out of the store, and no weapon of any kind was found in or about the store afterwards; and that after the shooting, the defendant walked away and was soon afterwards arrested in a house not far off. These facts appeared from the testimony of half a dozen persons, the only witness to the shot fired while Bradley was in the store being a female who was passing by. The only witness for the defendant who saw any of the shooting was a woman who testified that she went to the store and made a purchase of Bradley, who was then alone; that she took her package and walked immediately out, and when she had gone about 150 yards she heard a shot, turned round and saw the defendant come out of the store followed by Bradley, whose left hand was down by his side and his right hand raised as if to strike or catch something, stepping sidewise, facing the store and facing the defendant, who was backing and who fired three times while so doing; and that Bradley was rushing on him, and he (defendant) was retreating all the

time.  One other point on which her testimony directly
conflicted with that for the State, was where she stated
that nobody came up there at all, and she staid there
about five minutes.  Two witnesses testified that they
knew her general character, that it was bad, and that
from it they would not believe her on oath in a court
of justice.  The policeman who arrested the defendant
was his second cousin.  He testified that he examined
the defendant immediately upon reaching the prison
(which was about an hour after the killing), and found
a knot or lump on the back part of the left side of his
head, about an inch above the ear, looking as if it were
freshly made, and a hole, or two holes, in his hat (a soft
hat) on the part which would fit over the knot or lump.
The coroner testified that, late the next afternoon, he
examined the defendant's head and found a lump or a
small indurated spot pushing the skin up on the side of
his head; that it could have been made by any kind of
instrument somewhat pointed, the small part coming
in contact with the head, or by some dull instrument
or by the defendant bumping his head; and that he
did not then notice any rent in his hat, though there
might have been one, but he noticed that it was a soft
hat.  Two other policemen testified that in the evening
of the day of the killing, which occurred about noon,
they examined the defendant's head at the place where
he told them he had been struck, and found no lump or
wound or bump or anything of that sort.  In the pris-
oner's statement he said that on the day of the killing
he was feeling very badly, and took a drink of whiskey
about ten o'clock ; that he and his partner in business
had a bill against Bradley for a barrel of potatoes,
which bill he (defendant) sent by a negro porter for
collection ; that the negro returned and said the bill
was not right, and upon being sent again, returned and
said, " Bradley won't pay it "; that defendant took it,

and without thinking of having any trouble, carried it to Bradley's store and very politely walked up and presented it; that Bradley looked at it and said, "This is the same bill that you presented by that negro. I told him I would not pay it, and I told him to get out of my house or I would kick him out." The defendant said, " Mr. Bradley, the bill is correct," to which Bradley replied, " I told him I would kick him out, and I now tell you the same thing. Go out, or I will kick you out." Said the defendant, " That is not the way to talk to a gentleman." "Just as I said that, he raised with a stick and struck me on the side of the head, and he struck me a second time. I kept backing towards the door, and thinking that my life was in danger I pulled my pistol and commenced shooting. Being dazed with the blow, I did not know what had happened until the thing was over with. I did not realize that I had killed anybody at all until I saw Bradley fall, although I thought at the time that I was protecting my life. I did not then and don't know now how many times I had fired, until the thing was all over."

C. T. LADSON and HULSEY & BATEMAN, for plaintiff in error.

C. D. HILL, solicitor-general, and ELLIS & GRAY, contra.

LUMPKIN, Justice.

1. After eleven jurors had been selected, but not sworn in chief, and, by direction of the court, had been kept together for a day and night, one of them became sick, and was unable to serve. The court satisfied himself of the juror's illness, which he certainly had a right to do without summoning a physician, and then discharged him, and proceeded regularly until two other jurors were selected and the panel completed. There was no error in this conduct of the court. See *Pannell* v. *State*, 29 *Ga.* 681, and *Hanvey* v. *State*, 68

*Ga.* 612. In the latter case, it appears that the juror did present a certificate of a physician that he was unable to serve, but it further appears that the judge himself, counsel consenting, heard the juror's excuse under oath, and determined therefrom that he was, on account of his sickness, unable to serve. It is immaterial how the fact of sickness is shown, if the judge is satisfied it exists. The consent of counsel was unnecessary to the validity of the court's action.

2. Defendant's counsel presented to the court a request in writing, which was as follows: "The defendant's counsel request that the court give in charge to the jury the sections of the code defining and relating to the law of voluntary manslaughter and of justifiable homicide." It appears, from an examination of the record, that the court complied literally with this request except so far as it related to justifiable homicide. He read to the jury the sections of the code defining voluntary manslaughter, and explained to them distinctly the difference between murder and manslaughter, emphasizing the fact that the chief distinction between these two offences was, that in murder malice must exist, while in manslaughter there was an absence of malice. In no possible view of the case would a charge concerning justifiable homicide have been legal or proper. Indeed, the zealous and faithful counsel for the prisoner who argued the case before this court virtually conceded that the law of justifiable homicide had nothing to do with it. We therefore find no reason in this ground of the motion for granting a new trial.

3. The court, when instructing the jury as to the form of their verdict, did not state to them that they might find the defendant guilty of voluntary manslaughter. There was no request made to this effect, nor was any complaint made, either in the motion for a new trial or in

the bill of exceptions, of the failure of the court to so instruct the jury. The question, therefore, is not made by this record, and cannot now be adjudicated, whether such failure was error or not. It was argued before us that the court ought to have distinctly told the jury that they could convict this defendant of voluntary manslaughter, but the fact that he did not do this is, as already stated, nowhere assigned as error. But suppose this had been done, would any benefit therefrom have resulted to the plaintiff in error? Taking the entire charge together, it in effect amounted to instructing the jury that if they should believe the defendant was guilty of voluntary manslaughter, they must acquit him. The judge plainly and clearly defined what was necessary to constitute murder, and told the jury, in substance, that unless they believed the defendant guilty of this offence, they must find him not guilty. In one view, this charge was more favorable to the defendant than he had any right to expect or demand, because, following it, the result would have been an acquittal even though the jury believed he was guilty of voluntary manslaughter. Be this as it may, we think it is clear, from the record in this case, that if the judge had plainly instructed the jury they could convict of this offence, they would not have done so. If there had been the slightest inclination on the part of the jury to reduce this crime below the grade of murder, they would most assuredly have recommended imprisonment for life, and thus have averted the penalty of death. The fact that they found the defendant guilty without making such recommendation, is absolutely conclusive that in no event would they have rendered a verdict of voluntary manslaughter. This conclusion is fortified by the fact that the judge in his charge plainly and repeatedly told them that the penalty must be death unless they recommended lifetime imprisonment, and used language which must have im-

pressed upon them in the most solemn and emphatic
manner the grave responsibility which rested upon them
of deciding whether this man should be sent to the
penitentiary or the gallows.

4. After a witness for the defendant had sworn that
he knew the defendant, and had known him for a long
time, that his character for peaceableness was good,
and he had never heard of his having any difficulty at
all, it was not error to allow the State's counsel, on
cross-examination, to ask the witness if he had never
heard of defendant shooting any one before, and, also,
if the witness had never heard of his shooting a man
in another State.   A knowledge of character is derived
from general reputation, and the witness having sworn,
in effect, that the reputation of the defendant was good
as a peaceable man, and that he had never heard any-
thing to the contrary, it was certainly allowable, on
cross-examination, to sift the witness as to the accuracy
of his testimony and the sincerity of the statements
made by him.   What the witness heard would not, of
course, be evidence of the truth thereof, nor would
it be proper to go into the details of the occurrences
referred to ; but to the extent indicated, the questions
were proper  and the answers thereto admissible.

Section 3874 of the code, as to impeached witnesses,
is as follows : "The witness may be sustained by sim-
ilar proof of character.   But the particular transac-
tions, or the opinions of single individuals, cannot be
inquired of on either side, except upon cross-examina-
tion in seeking for the extent and foundation of the
witness's knowledge." In Reg. *v.* Wood, 5 Jurist, 225,
the defendant put his character in issue, and a witness
deposed to having known him for some years, gave him
a good character, and stated that he had never heard
anything against him.   On cross-examination, the wit-
ness was asked if he had never heard that defendant

was suspected of having committed a robbery in the
neighborhood some years previous. The question was
allowed, Parke, B., remarking that: "The question is
not whether the prisoner was guilty of that robbery,
but whether he was *suspected* of having been implicated
in it. A man's character is made up of a number of
small circumstances, of which his being suspected of
misconduct is one." This case is cited approvingly in
1 Taylor on Evidence, §352, and the author says: "But
if, with the view of raising a presumption of innocence,
witnesses to character are called for the defence, the
counsel for the Crown may then rebut this presump-
tion by cross-examining the witnesses, either as to
particular facts, or, if they deem it essential, as to the
ground of their belief." Reg. *v.* Wood is also cited
approvingly in Best on Evidence, §261, where the doc-
trine is also laid down that, when a defendant in a
criminal prosecution puts his character in issue, the
prosecutor may encounter his evidence either by cross-
examination or by contrary testimony. In Abbott's
Trial Brief of Criminal Causes, §473, we find the fol-
lowing: "A witness who has testified to the good char-
acter of the accused may be asked, on cross-examina-
tion, if he has not heard of a specific charge against
the accused,"—citing Ingram *v.* State, 67 Ala. 67, which
was a murder case wherein it was held: "The shad-
ings, as well as the brighter hues, are to be considered
in making up the estimate of character and reputation;
and, when a witness has testified that he knew the
character of the accused for peace and quietude, and
that it was good, it is not error to allow him to be
asked, on cross-examination, if he had not been in-
formed that the defendant had 'killed a man in the
State of Georgia,' and his answer was admissible in evi-
dence." Reg. *v.* Wood, *supra,* and DeArman *v.* State,
71 Ala. 351, are also cited by the author in support of
this proposition.

The ruling of this court in *Harris* v. *State*, 61 *Ga.* 359, is not in conflict with the view expressed in this case on the point under consideration. In that case, *the court* asked the witness, who had testified to defendant's peaceable character, if he had not heard that defendant once beat his wife with a butcher's file. It was held that, while the presiding judge may ask pertinent questions, he should not exercise this right in such manner as to intimate an opinion against the prisoner, and for this reason it was decided that it was improper for *the court* to ask the question. Another decision of this court seemingly at variance with our ruling on this question in the case at bar is that rendered in *Pulliam* v. *Cantrell*, 77 *Ga.* 563. It was there held that it was proper to refuse to allow a witness who testified to the good character of another witness to be asked, on cross-examination, if the latter had not been found a defaulter of public funds, or if the witness testifying had never heard he had been so found; but Judge JACKSON distinctly states the question was not asked to show the foundation or extent of the witness's knowledge of the character of the person of whom he was testifying, and that it was an effort to prove a conviction of embezzlement by hearsay, which was, of course, improper. Taking the ruling in connection with the fact stated, it is not at all in conflict with our decision as to the question asked the witness Camp in the present case.

5. Under our law, juries trying murder cases have the right to avert the death penalty by recommending life imprisonment, and it is therefore not improper for counsel to argue before them the question whether or not they should so recommend. It may not be proper for counsel to state that they should not recommend life imprisonment because the Governor of the State might pardon the defendant, and he would therefore be

set free; but if such a statement is made, and the at
tention of the court is not called to it, and he is no-
asked to make any ruling thereon, it will afford no
ground for a new trial.

6. One ground of the motion for a new trial assigned
as error the following charge of the court: "If, how-
ever, you choose to give the statement force, then you
must consider the degree of force you will give it; and
the law, in its tenderness, goes so far as to place it
within the province of the jury to allow them to give
it force, if they choose, to the extent of believing it in
preference to the sworn testimony. But the statement
should have no greater force than evidence. It is to be
measured as the law measures testimony. Evidence in-
troduced by the State against the defendant is intended
to be inculpating; that is, it is meant to tend in the
direction of guilt. The statement of the defendant, to
have any effect, should be upon the other side; it should
be exculpatory upon legal grounds." This is an ex-
tract from a lengthy charge by the court concerning
the defendant's statement. So much of it as precedes
the words, " But the statement should have no greater
force than evidence. It is to be measured as the law
measures testimony," is undoubtedly correct; and as
no particular portion of it is alleged to be erroneous,
the exception taken is too general, in accordance with
established rules, to be considered. If it means that
the entire charge objected to is erroneous, this is not
sound, because much of it is good law; and if com-
plaint is intended to be made of some part thereof, the
same should be specified. We are, therefore, con-
strained to hold that no assignment of error is properly
set forth in this ground.

We gather, however, from the argument before us,
that the part of the charge intended to be complained
of is that beginning with the words last above quoted,

and extending to the end. Suppose, then, this excep-
tion had been properly taken, would it have been suf-
ficient to require a new trial? The motion alleges that
the charge is erroneous because it is dubious and mis-
leading; because it deprived the statement of the po-
tentiality given it by law, and because it amounts to
saying the statement cannot avail defendant where not
in conflict with the evidence. We do not think these
objections are well taken. As to the first, it may be
true that the charge was dubious, but we do not think
it misled the jury as to their right to believe the state-
ment. We have endeavored earnestly to ascertain
what the court did mean by some of the expressions
used. By the words, " But the statement should have
no greater force than evidence. It is to be meas-
ured as the law measures testimony," it is obvious that
the court referred to the probative value of the state-
ment, and not to the question of its credibility. He
could not have meant to refer to the latter, because he
had just told the jury they could believe the statement
in preference to the evidence, and emphasized this as-
sertion by saying the law in its tenderness allowed this
much weight to be given to a prisoner's statement. In
other words, we think the idea conveyed by the court's
language was this: a fact established by a statement
is to have no greater value than a fact established by
evidence; that is, a fact proved to the satisfaction of
the jury is simply a fact for whatever it is worth, and
should have no more force and effect because it is made
to appear by the prisoner's statement than the same
fact would have if sworn to by a credible witness.
There is a manifest difference between the question,
shall the jury believe a thing asserted by the prisoner
to be the truth? and the question, assuming the thing
asserted to be true, what effect has it in determining
what conclusion in the case shall be reached? This is

the distinction we think the court intended, and we are sustained in placing this construction on the court's language, because he immediately proceeded, in effect, to instruct the jury that, to be available to defendant, the statement must be exculpatory in its effect. By this he undoubtedly meant to say that no matter how true and credible a statement might be, the facts contained in it must be pertinent to the issue, and must set up a legal defence in order to be of practical benefit to the accused. Taking the entire charge together, we repeat we are satisfied that the jury were not misled as to the legal effect which they might give to the statement, and that they fully understood it to be their right and privilege, if they saw proper, to believe the statement in preference to the sworn testimony. It is quite evident that they did not believe the statement at all. If they had, they would undoubtedly have exercised the power given them by law of saving the defendant from the penalty of death by recommending imprisonment for life. The statement is improbable, inconsistent with the sworn testimony of disinterested witnesses, and made by the defendant under the strong temptation to say anything he could which might save him from death or a term in the penitentiary. Taken in the best possible view, it would make him unquestionably guilty of voluntary manslaughter, and, as we have already shown, the jury had no disposition to convict him of that offence. It is quite plain, from a careful examination of the entire record, that they believed him guilty of murder, and that they rejected his statement altogether, although they must have understood they had the right to believe it if they saw proper.

In this connection we will state that it would be a much wiser and safer practice for our brethren on the circuit bench, in charging concerning statements made by defendants, to confine themselves to the language of

the statute upon this subject, and not indulge in extended comments upon the effect to be given to such statements. This course on their part will relieve them and this court of much embarrassment and difficulty arising from a contrary practice.

The evidence discloses that an atrocious, unprovoked and deliberate murder was committed by the defendant. The verdict finding him guilty and imposing upon him the penalty of death, in our opinion, renders exact and substantial justice. After a thorough, careful and anxious examination of the entire record, we are fully convinced that the judgment of the court below should stand. It is well-known that juries are reluctant to take away by their verdicts the lives of their fellow-creatures; and when good men, in the faithful and conscientious discharge of a painful duty, enforce and vindicate the law, as the jury in this case undoubtedly did, we do not feel authorized to discourage them, and others who may try such cases in the future, by setting aside a verdict which is manifestly right.

*Judgment affirmed.*