THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN Y. McKANE, Appellant, Impleaded with Others.

*Extraordinary Oyer and Terminer — validity of the appointment — grand jury therefor drawn while another grand jury is in session — Penal Code, §§ 29 and 41c — an abettor is guilty as a principal — publicity of the election registry — requirements of the law relative to registration — punishment for the violation thereof — charge of a joint crime in an indictment — evidence of acts and declarations of co-conspirators — order of proof — evidence as to the power to carry out the conspiracy — conviction of another crime — judicial notice taken of the population of political divisions — official returns the best evidence of the result of an election — direction limiting the effect of evidence — judgment, when reversed on appeal — evidence of a conversation through a telephone — cross-examination as to reputation — reversal for error in the charge.*

If the language used by the Governor of the State of New York in appointing an extraordinary term of the Court of Oyer and Terminer is susceptible of two constructions, that one must be preferred which is consistent with a valid appointment instead of that which would render it invalid. Such an appointment is not invalid by reason of the use therein of the words: "I do hereby appoint an extraordinary Court of Oyer and Terminer," instead of "an extraordinary term of the Court of Oyer and Terminer."

Where a grand jury is drawn for an extraordinary term of a Court of Oyer and Terminer by an order of a judge of the Supreme Court, under the provisions of section 226 of the Code of Criminal Procedure, the statutory authority for drawing the same is ample, notwithstanding the fact that another grand jury, impanelled by the Court of Sessions in the same county in which the extraordinary term of the Court of Oyer and Terminer was appointed to be held, is, at the same time, lawfully in session.

Under the provisions of sections 29 and 41c of the Penal Code, if any member or clerk of a registry board of an election willfully violates any provision of the Election Law relative to the registration of electors, or willfully neglects or refuses to perform any duty imposed on him by law, or is guilty of any fraud in the execution of the duties of his office, he is punishable by imprisonment for not less than two nor more than ten years. If any person aids or abets such member or clerk of a registry board in such violation, whether he himself is present or absent, or if he directly or indirectly counsels, commands, induces or procures any member or clerk of the registry board to commit such willful violation, he is guilty of the same offense, not as an accessory, but as a principal.

While it may be literally true that a non-existing paper cannot be concealed, an effective way to withhold a paper which the law commands to be made and kept accessible is to refuse to make it, thus withholding its accessibility by withholding its existence; proof, however, that such paper was not made, would tend, in connection with other circumstances, to support an allegation that those whose duty it was to make and keep the same accessible, had refused to keep it accessible to the public.

The publicity of the election registry may be subsequent to the mere act of registration, but the law relative to the registration provides for its publicity, to the end that the registration itself shall have all the beneficial effects publicity can give it, and all the safeguards for verity and fairness which a jealous and vigilant public scrutiny can secure. The publicity of the registry is an essential feature of the law relative to the registration of electors, which law may be regarded as one subject embracing all details necessary to its completeness and efficiency, and every one of such details is a part of the law relative to the registration. If a clerk or member of the registry board withholds the list of voters, which he is required by law to keep accessible to the public, he may be punished for a violation of the law relative to the registration of electors, notwithstanding the fact that the registration was at the time complete.

The charge in an indictment of the joint commission of a crime by specific individuals implies the charge of the individual guilt of each person joined in the charge, and in a proper case may admit of the conviction of one and the acquittal of another defendant. It is a charge of one crime against two or more defendants.

Where, upon the trial of a prisoner, a conspiracy is shown to exist, the acts and declarations of any of the conspirators in furtherance of the conspiracy are admissible in evidence against the prisoner if he be a member of the conspiracy; and it is not necessary that the co-conspirator whose acts and declarations in furtherance of the ends of the conspiracy are sought to be put in evidence, should be a party to the record in order to render the same admissible.

While the general rule is that a conspiracy must be shown before the acts and declarations of the conspirators, other than the defendant on trial, can be admitted in evidence, yet such rule is not so rigid as to require the sacrifice of truth and substance to matters of form, nor to forbid the trial judge to receive evidence in such order and to such extent as will develop as clearly as possible the whole truth. It may be that the whole story must be told before the court or jury

can be sufficiently instructed to pass definitely upon the preliminary fact of the conspiracy itself; and whether there was or was not a conspiracy may be such a disputed question that the defendant is entitled to have the jury pass upon it; it is, therefore, largely in the discretion of the trial court to determine as to the order of proof.

It is competent to show, upon the trial of a prisoner, that he had the power to carry into execution a conspiracy, as he is charged to have done, through and by means of which the crime in question is alleged to have been committed by him.

While it is true, as a general rule, that a conviction for one crime should not be obtained by proof of another, yet the rule does not apply where the two crimes are so related that the one involves or implies the other, or is a step in its commission.

Courts will take judicial notice of the population of political divisions of the State within their jurisdiction, and on a trial upon the question as to such population of political divisions the official enumeration of the inhabitants of a particular political division taken pursuant to chapter 5 of the Laws of 1892 is admissible in evidence.

As a general rule, no better evidence of the result of an election is obtainable than the official returns afford, and in cases of the nature of a quo warranto, election returns are presumed to be true until shown to be false.

Where evidence is admissible for legitimate purposes upon the trial of an action, the most to which the party against whom the same is offered is entitled, is to ask that such direction be given by the court to the jury as will limit the effect of such evidence to such legitimate purposes.

A judgment will not be reversed upon appeal on account of a casual incompetent statement by a witness unexpectedly made during the course of a trial, when no motion was made to strike out the same, unless justice plainly requires the reversal of the judgment.

A conversation had between a prisoner and a witness through a telephone is admissible in evidence upon the trial of a criminal action upon proof of the fact that the prisoner was the person with whom the conversation through the telephone was had.

Where, upon the trial of a criminal action, the defendant produces evidence in general terms that his reputation is good, the People are at liberty to ask upon cross-examination what his reputation is in respect to certain important particulars within the reasonable range of the subject introduced by the defendant.

When, upon the trial of a criminal action, after the charge of the judge to the jury, the defendant withdrew exceptions taken to the refusals of the court to charge as requested, no error in the charge will justify a reversal of the judgment upon an appeal from the judgment rendered against the defendant, unless it be clear that it in fact prejudiced the prisoner.

It may be said of all material evidence, given upon the trial of a criminal action, that it tends to sustain some affirmative or negative position, and it is not error for a trial judge to charge the jury that certain evidence would tend to sustain a certain inference or an alleged fact, where he does not say how strongly or

feebly it tends to sustain the same, and, when he makes the distinction that while he may allude to evidence as tending to establish a certain fact, it is for the jury to determine whether they believe such evidence, and if so, whether it does establish such fact.

APPEAL by the defendant, John Y. McKane, from the judgment of the Supreme Court, rendered at an extraordinary term of the Kings County Oyer and Terminer on the 19th day of February, 1894, upon the verdict of a jury convicting the defendant of willfully violating a provision of the Election Law relative to the registration of electors.

The defendant McKane was indicted jointly with the three inspectors for the first election district of the town of Gravesend. He was not an inspector of election. All the defendants were accused, in one count of the indictment, of willfully violating a provision of the Election Law relative to the registration of electors, and in another count, of willfully neglecting and refusing to perform a duty imposed upon them by such law.

The facts charged as constituting the crime were the willful refusal and willful neglect of the inspectors to keep the registry lists accessible to the public, McKane inciting and aiding them. The defendant McKane, in pursuance of his demand, was separately tried and convicted; he was sentenced to imprisonment in the State prison for the term of six years.

The indictment was found by the grand jury convened at an extraordinary court of Oyer and Terminer, appointed by the Governor of the State on the 21st day of November, 1893, to be held in the city of Brooklyn on the 18th of December, 1893.

Further facts appear in the opinion.

*Edward C. James* and *George W. Roderick*, for the appellant.

*Benjamin F. Tracy* and *Edward M. Shepard*, for the respondent.

LANDON, J.:

The Court of Oyer and Terminer at which the defendant was indicted was held in pursuance of an appointment made by the Governor. Section 234 of the Code of Civil Procedure provides that : " The Governor may, when, in his opinion, the public interest so requires, appoint one or more extraordinary General or Special

Terms of the Supreme Court, or terms of a Circuit Court or Court of Oyer and Terminer."

The language of the Governor's appointment was: " I do hereby appoint an extraordinary Court of Oyer and Terminer to be held," etc.

The counsel for the appellant urges that the power to appoint an extraordinary *term* of the Court of Oyer and Terminer is not complied with by appointing an extraordinary *Court* of Oyer and Terminer, and that no power exists to appoint such extraordinary court, and hence that the appointment was a nullity, and all that has been done under it is void.

We do not think this contention valid; it is based upon a verbal difference between the form of the statute and the form of the appointment. But there is no mistaking the fact that the Governor intended to appoint and did in fact appoint an extraordinary term of the Court of Oyer and Terminer.

If the language of the appointment is susceptible of two constructions that one must be preferred which validates the appointment, instead of that which invalidates it.

The defendant moved to set aside the indictment · upon the ground that the grand jury of the county of Kings, lawfully impanelled by the Court of Sessions, was in session from December 4 to December 30, 1893, during part of which time the grand jury for this extraordinary term of the Court of Oyer and Terminer, which found the indictment against the defendant, was also in session, the contention being that while one grand jury is lawfully in session another cannot be convened.

Section 225 of the Code of Criminal Procedure provides that a grand jury must be drawn for every term of the following courts :

" 2. 　＊　＊　＊　The Court of Sessions of the County of Kings."

Section 226 provides that : " A grand jury may also be drawn, ＊　＊　＊　3. For the Court of Oyer and Terminer of the county of Kings, upon the order of a judge of the Supreme Court elected in the second judicial district."

Mr. Justice CULLEN, of the second judicial district, made the order for drawing this grand jury. The court was none the less the Court of Oyer and Terminer because the term thereof was extraordinary

instead of ordinary.   The statutory authority for drawing this grand jury is ample.

The defendant demurred to the indictment in that it did not contain a plain and concise statement of the acts constituting the alleged crime.   This defect is alleged to exist in the statement of the acts charged to have been committed by the inspectors.

The crime charged in the first count of the indictment is : " Willfully violating a provision of the Election Law relative to the registration of electors."   Section 41c of the Penal Code provides that : " Any member or clerk ·of a registry board who willfully violates any provision of the Election Law relative to the registration of electors, or willfully neglects or refuses to perform any duty imposed on him by law, or is guilty of any fraud in the execution of the duties of his office, shall be punishable by imprisonment for not less than two nor more than ten years."   Thus the crime charged in the indictment is a crime specified in the statute.   The defendant McKane, however, was neither a member nor clerk of the registry board.

But section 29 of the Penal Code provides : " A person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a principal."

Hence it follows that if any member or clerk of the registry board of the first election district willfully violated any provision of the Election Law relative to the registration of electors, and the defendant McKane aided and abetted in such violation, whether he himself was present or absent, or if he directly or indirectly counselled, commanded, induced or procured any member or clerk of the registry board to commit such willful violation, he, McKane, was guilty of the same offense, not as an accessory, but as a principal.

The objection that the crime defined in section 41c is therein limited to the officers composing and assisting the registry board, and, therefore, cannot embrace the defendant McKane, is clearly met by section 29, which by the aptness and comprehensiveness of its terms includes whoever does aid and abet the violation of the law, or counsels, commands, induces or procures its violation by the

officers charged with its administration. Section 29 makes the acts, not the office of the offender, the test of his crime.

The accusation in the indictment being of a crime defined by the statutes, it remains to be seen whether the acts charged against the defendant constitute the crime whereof he is accused.

Clearly, under the two sections of the Penal Code just cited, the specifications should allege that some clerk or member or members of the registry board did some act or acts which amounted to a willful violation of some provision of the Election Law relative to the registration of electors, and that the defendant McKane aided and abetted, or counselled, commanded, induced or procured the officers, or one or more of them, to do these acts.

From the nature of the case the acts of the officers constituting the violation of the law would seem to be susceptible of plain and direct statement. And we find such a statement. Sections 31, 32 and 33 of the Election Law (Chap. 680, Laws 1892) provide that the inspectors of election for each election district, elsewhere than in a city, shall meet on the third and second Saturdays before each general election, and prepare at such meetings a list of the names and residences of persons qualified to vote in such district at such election, which list, when completed, shall be the register of the voters of the district for such election.

The inspectors shall append to the list a certificate to that effect, and this certified list shall remain in the custody of the chairman of the inspectors until the close of the polls on election day. But the inspectors, not later than the Monday following each Saturday of their meeting, shall make three certified copies of such original list and certificate, one of which shall be conspicuously posted in the place where such meetings shall have been held, and one shall be retained by each of the other two inspectors until the close of the polls of such election. "Such list and registry of voters, and the certified copies thereof, shall at all reasonable hours be accessible to the public for examination or for making copies thereof."

The indictment alleges that the inspectors composing the board of registry did make and complete and certify the original list of persons qualified to vote in the first election district at the next general election. It does not allege that they made any certified copies, but does allege that they did willfully and knowingly neglect and

refuse to have such lists and register of voters and three certified copies thereof accessible at all reasonable hours to the public for examination and for making copies thereof.

The defendant urges that because it is not alleged that these three copies were made, therefore, it could not be alleged that any one or all of them were withheld or concealed. It may be literally true that a non-existing paper cannot be concealed, but it is true that an effective way to withhold a paper which the law commands to be made and kept accessible, is to refuse to make it, thus withholding its accessibility by withholding its existence. Proof that it was not made would tend, in connection with other circumstances, to support the allegation that the inspectors refused to make it accessible.

The defendant also contends that the registration was complete, and, therefore, the subsequent withholding or concealment of the list and copies was not a violation of any provision of the law " relative to the registration." But the law requires the registry to be made and one copy posted, and the original list and two copies to be otherwise accessible to the public. Thus the publicity of the registry is an essential feature of the law " relative to the registration of electors."

The publicity of the registry may be subsequent to the mere act of registration, but the law relative to the registration provides for its publicity, to the end that the registration itself shall have all the beneficial uses publicity can give it, and all the safeguards for verity and fairness which a jealous and vigilant public scrutiny can secure.

The law relative to the registration may be regarded as one subject, embracing all the details necessary to its completeness and efficiency ; thus making every one of such details part of the law " relative to the registration."

The indictment then proceeds to specify, in connection with the crime of the inspectors, how the defendant McKane was " concerned in the commission" of the crime by them : " And the said John Y. McKane did then and there maliciously, feloniously, unlawfully, willfully and knowingly counsel, command, induce, procure, aid and abet the said John W. Murphy, Morton Morris, and John H. Brownhill to so neglect and refuse to have such lists and register of voters and three certified copies thereof at all reasonable hours accessible to the public for examination and for making copies thereof." The indict-

ment then further alleges that the defendant McKane and the defendants, the inspectors, did feloniously and willfully cause and procure that the said list and register of voters and three certified copies thereof and each of them should not be accessible to the public for examination or for making copies thereof, but should be concealed from the public, whether wanted for examination or making copies thereof.

The defendant does not contend that the acts which charge him with aiding and abetting, commanding, counselling, inducing and procuring, are not sufficiently alleged.

The second count of the indictment differs from the first only in charging the crime; the specification of the facts constituting it are the same as alleged in the first count.

The second count charges the crime as follows : " And the grand jury, aforesaid, by this indictment, do further accuse the said John Y. McKane, John W. Murphy, Morton Morris and John H. Brownhill, the said John W. Murphy, Morton Morris and John H. Brownhill being members of a registry board, of the crime of willfully neglecting and refusing to perform the duties imposed upon them, the said John W. Murphy, Morton Morris and John H. Brownhill, by law, as members of a registry board," etc.

The learned counsel for the defendant insists that since the statute requires the chairman of the inspectors to take into his custody the original registry list, and each of the other inspectors to take into his custody one of the certified copies, all of which shall be accessible to the public, if the crime proved had been the concealment by one inspector only of his list, without participation by the others, then such crime would not be neglect of duty by the inspectors as members of a registry board, as charged in the indictment, but of the offending inspector only, and, therefore, if the defendant .McKane had aided and abetted him, he would not be guilty of the crime whereof he was accused, but of some other crime.

Theoretically this may be conceded, but the concession would not affect the sufficiency of the indictment, but the sufficiency of the proof of the joint crime charged in the indictment.

The trial court at the request of the defendant's counsel charged the jury : " That although the jury may be satisfied that the defendant was guilty of other crimes or violations of the Election

Law, it is their duty to acquit, unless they find him guilty of the particular crime charged in the indictment." The court also instructed the jury that their first duty was to determine whether the guilt of the inspectors was made out, and also added: "It is essential, in other words, to successfully maintain the case for the prosecution that you should be satisfied by proof, which leaves no reasonable doubt in your minds, that the inspectors of the first election district had neglected and refused, and did neglect and refuse, to perform the duties which the law imposed on them in respect to keeping the registry list and certified copies accessible to the public."

The evidence on the part of the People was directed to showing that the keeping of the registry lists inaccessible to the public was the common purpose and act of all the inspectors. We conclude that the suggestion of error arising from the possible guilt of one inspector and the innocence of the others, presents a hypothetical, and not the actual case before us.

The defendant specified as a further ground for the demurrer, that more than one crime is charged in the indictment.

The indictment itself clearly shows that each inspector is not charged with a separate crime in addition to the joint crime in which the defendant McKane is charged with participating; of course the charge of the joint commission of a crime implies the charge of the individual guilt of each person joined in the charge, and in a proper case may admit of the conviction of one and the acquittal of another defendant.

But this is not to charge two separate crimes against one defendant, but to charge one crime against two or more defendants.

This indictment contains three counts; the facts constituting the crime are the same in each; the crime charged in the first count is the willful violation of the Election Law relative to registration; in the second count, the willful neglect or refusal to perform a duty imposed by law; and in the third, the willful commission by the inspectors of a fraud in the execution of the duties of their office.

Section 41c of the Penal Code, above quoted, groups these three crimes together. It is possible that cases may arise in which the distinction between these three crimes will be clearly perceived. Upon the trial it was thought that the facts charged as constituting

SECOND DEPARTMENT, JULY TERM, 1894.            [Vol. 80.

the crime were less clearly applicable to the third enumeration of crime than to the first and second, and thus the third count was abandoned as unnecessary.

The distinction between the two crimes charged in the first and second counts is not here clearly seen. The willful violation of law, and the willful neglect to obey it, must often be different forms of stating the same substance, since both may result from the same acts. Such is the case here.

Section 279 of the Code of Criminal Procedure aptly meets such a case. It provides : " Where the acts complained of may constitute different crimes, such crimes may be charged in separate counts."

There are many exceptions to the rulings of the court upon the admission of evidence. The learned counsel for the defendant, in pressing these exceptions upon our notice, practically ignores the fact or theory of a conspiracy upon which the People presented their case upon the trial, and the rules applicable in cases of conspiracy under which the trial court admitted much of the evidence excepted to.

The theory of the People was that the defendant McKane and the inspectors of election of the six election districts of the town of Gravesend, and several members of the police force, and some members of the town judiciary, entered into a conspiracy to accomplish the concealment of the several registration lists of the six election districts, that is to say, to prevent any examination or copying of the lists by persons not in political sympathy with McKane, and especially by Mr. William J. Gaynor and his supporters. Mr. Gaynor at the time was a candidate for election, at the general election about to be held, for the office of justice of the Supreme Court in the second judicial district of the State, a district which embraces Kings county, and thus the town of Gravesend.

If such a conspiracy was shown to exist, then the acts and declarations of any of the conspirators in furtherance of the conspiracy were admissible in evidence against the defendant McKane, one of the members of it.

It is not necessary that the co-conspirator, whose acts and declarations in furtherance of the ends of the conspiracy are offered in evidence, should be a party to the record.

It is plain that the indictment or non-indictment of the conspira-

tor whose acts and declarations are offered against his fellow, can neither impart any quality of verity or of relevancy to such acts and declarations, nor withdraw it from him, and, hence, his inclusion or exclusion as a party to the indictment is not material.

The evidence given tending to prove the conspiracy was circumstantial in its character; from the very nature of the case, part of the evidence tending to prove the conspiracy tended also to prove what the conspirators did in furtherance of it. While the general rule is that the conspiracy must be shown before the acts and declarations of the conspirators, other than the defendant upon trial, can be admitted in evidence, yet this rule, wisely framed for the protection of the defendant, is not so rigid as to require the sacrifice of truth and substance to matters of form, nor to forbid the trial judge to receive evidence in such order and to such extent as will develop as clearly as possible the whole truth. It may well be that the whole story must be told before the court or jury can be sufficiently instructed to pass definitely upon the preliminary fact of the conspiracy itself. And when it is all told, it may yet be such a disputed question that the defendant is entitled to have the jury pass upon it. It must, therefore, in order that justice be not stayed at the threshold of the trial, be left largely to the discretion of the trial court to determine as to the order of proof.

Upon appeal we must look at the whole evidence to see whether the fact of the conspiracy was sufficiently proved to justify the admission of the acts and declarations of the defendant's co-conspirators as part of the very *res gestæ* of the attempted execution of the conspiracy itself.

We cannot undertake to present it here, but the mere skeleton of the propositions of fact, by which the inference of the existence of the conspiracy was sought to be conclusively lodged in the minds of the court and jury, will show the reason for the admission of the several masses of circumstantial testimony, and at the same time help us to realize its collective force.

I. The motive of the defendant McKane to form and execute such a conspiracy was alleged to be, to continue and to increase the prestige of political power which he had already acquired, by controlling the vote or the returns of the vote of his town, and abnormally increasing its numerical and almost unanimous total; especially

also to deprive Mr. Gaynor of the means of preventing manu-factured or swollen returns, adverse to his election.

II. The means and ability of the defendant McKane to form such a conspiracy embraced a mass of facts, tending to show his extraordinary political, official and financial power in the affairs of his town and townsmen, and his relations with and influence over his alleged co-conspirators.

III. Especially was his opportunity to form and control such a conspiracy increased by the fact that the six election districts of the town were so laid out that every one of them embraced a part of the town hall building, wherein was located the registration office and polling place of every district.

IV. It was shown that the registry lists in all the districts were kept inaccessible to Mr. Gaynor and his agents, despite their repeated and persistent efforts to obtain access to them, or to some official copy of them. Their efforts to obtain access and the means by which their efforts were baffled, tend to suggest the inquiry and pos-sibly to answer it — by whom were these things instigated, counselled and abetted, and for what purpose, and how wide must the con-spiracy have been to be so successful?

V. Mr. Gaynor, finding obstacles to his inspection of the registry lists apparently interposed by McKane, vigorously asserted and prosecuted his clear right to their inspection both in spite and in contempt of McKane and his power.

This action of Mr. Gaynor seems to have provoked McKane; his power and prestige were threatened, and it is not impossible that his sense of the enormity of the crime was obscured by his ambition to maintain his challenged supremacy.

It is proper also to observe that the People sought to show:

I. That Mr. Gaynor's agents, upon inquiry and inspection at the polling places in the town hall, did not find any lists posted where they could examine them.

II. That upon inquiry of the single policeman in charge, they were informed that McKane's order for inspection must first be obtained.

III. That McKane, upon being informed that such obstruction existed, assumed responsibility for it, and promised to remedy it.

IV. That McKane did not keep his promise, but warned **Mr.** Gaynor that he would have a hard job of it.

V. That Mr. Gaynor notified McKane in writing that he should send the necessary men to Gravesend to copy the rolls.

VI. That thereupon pretended copyists were selected from subordinates of the appellant, or dependents upon his favor as chief of the police, to monopolize the lists so as to keep them inaccessible to Mr. Gaynor's agents.

VII. That the pretended copyists, acting immediately under the direction of one Sutherland, a justice of the peace and member of the board of police of Gravesend, did, at the town hall, by pretending to make copies, keep the lists inaccessible to Mr. Gaynor's copyists, who made repeated attempts during several days to gain access to the lists. That Sutherland acted in concert with McKane was an inference sought to be proved from all the circumstances.

VIII. That Mr. Gaynor applied to the Supreme Court for a mandamus against the inspectors of all the districts, to compel them to permit him to copy the lists, but was defeated as to all the districts save the sixth, in consequence of the affidavits made by the defendant and others, McKane employing counsel for the purpose; McKane's affidavits confirmed some of the above statements.

IX. That Mr. Gaynor by his agents then sought to obtain copies of the lists in the hands of the individual inspectors in the several districts. There were eighteen of these inspectors. Upon inquiry and search, these inspectors were not then found, except that late on Monday before the day of election, under pressure of the mandamus, an inspector in the sixth district permitted his list, the least important of all, to be inspected.

X. That Mr. Gaynor, failing of success during the week ending Saturday preceding the election, sent his copyists, twenty-two in number, to Gravesend about midnight on Saturday, to the end that they might find the several inspectors at home early Sunday morning, and possibly thus succeed in obtaining at their homes the desired copies of the lists. When the copyists arrived in Gravesend, fourteen alighted at the station near the town hall, and were arrested upon the order of the appellant, who had previously received notice that they were coming to obtain copies of the lists. These copyists, thus arrested, were kept in durance until released upon habeas corpus

proceedings on the following Monday. These arrests defeated the attempt to procure the copies.

XI. That Mr. Gaynor had notified McKane that he would have the election watched on election day in order to prevent or detect fraud; he sent sixteen men to Gravesend for the purpose on the Monday evening previous to the election.

About twenty gentlemen volunteered their assistance and rode from Brooklyn to Gravesend in the early morning of election day. Twelve of those gentlemen had received appointments as Republican watchers, in apparent pursuance of section 103 of the Election Law.

They also had ready for service an injunction order issued the previous day by Mr. Justice BARNARD, restraining the defendant and others from preventing these Republican watchers from acting as such with the privileges the law confers upon such watchers. By the force exercised by the police of Gravesend, under the direction of the defendant, the men and watchers were assaulted and some of them arrested; the sixteen men sent to watch outside the hall were forcibly kept at such a distance that they were helpless and useless.

The injunction, when an attempt was made to serve it, was treated by the defendant with open contempt.

Reference will be made to some of the evidence tending to show stuffing of the ballot boxes, and the making of false returns.

We can readily understand, as we proceed with the examination of the record, the corroborative support which one series of facts gave to another, the relation which existed between facts at first apparently disconnected and remote from each other; their motive and explanation, if referable to a conspiracy; their apparent inconsequence and irrelevance, if considered apart by themselves, and how all the facts considered together assumed a cumulating cogency of force, compelling belief in their common inspiration and object.

We think that evidence tending to prove the conspiracy was admissible, and also evidence tending to prove what was done in furtherance of it. We will now notice the exceptions to the admissions of evidence.

It was shown that the defendant was the supervisor of his town, chief of police, chairman of the police board, and its treasurer.

The People were permitted to prove, the defendant objecting as immaterial and irrelevant, that in his capacity of supervisor the defendant was one of the seven members of the health board of the town and its chairman. This board was charged with the construction of sewers in the town.

The defendant was asked, upon his cross-examination, the extent to which the health board had constructed sewers in the town, and the debt created thereby. It may have been too trifling to be of significance. The answer was, that the debt created for the purpose was between $400,000 and $500,000.

A witness, Voorhees, was town clerk and commissioner of investment of moneys from the sale of the common lands of the town. He was asked — defendant objecting — to what officer he paid over the moneys received by him from the investments.

He answered to the defendant as supervisor. Asked as to the amount — defendant's objection being overruled — he answered that he paid him about $200,000.

These facts were relevant to the question of defendant's influence and power; it certainly was material to show what these were, because the charge against the defendant implied his possession of them in a very high degree. The facts themselves may have been extraneous to the crime charged, but not extraneous to his power and means to commit it.

The jury would have been justified in acquitting the defendant if upon the whole evidence they had had a reasonable doubt of his possession of sufficient power and influence among the inspectors and other assistants to form and manage such a conspiracy. This point thus became a prime factor in the People's case, and the evidence in question was relevant, just as the fact that a switchman is an habitual drunkard may be relevant to the question of his care in managing the switch; that an alleged forger is an expert penman may be relevant to the question of his ability to commit the forgery; that an alleged poisoner by morphine is a medical student, and has attended lectures given upon opium and its effects. (*People* v. *Harris*, 136 N. Y. 423.)

The evidence of the division of the town of Gravesend in 1890 into six election districts, so formed that the town hall building covered part of each one of them, which division still continues, was

relevant to the fact that the place was favorable to the formation and execution of the alleged conspiracy. It was objected that in this respect the evidence should be limited to the first election district.

Aside from the propriety of describing the locality as it actually was, it is clear that the conspiracy charged, in order to obtain its complete ends, must embrace all the election districts of the town.

That the defendant was the adviser of this plan of election districts was, in connection with its adoption, relevant to the question of his alleged power in the town, and to his prestige as the alleged controller of its vote, and his alleged ambition to continue and increase that prestige. It is not difficult to understand that this device of one town hall, reaching into six election districts, would give to the defendant's admirers an enlarged estimate of his powers and skill.

The People were permitted to give testimony, over defendant's objection, tending to show that he had used his official powers to the benefit of several of the Republican watchers at the general election in 1893. One of them was shown to have been awarded by the town board, of which defendant was the chairman, the contract, still in force, for the public electric lighting, amounting to upwards of $50,000; and of the other Republican watchers some were policemen, and others saloon keepers in the town, having a license; thus, some being under their chief and others engaged in a business in which the favor of the police might be desirable.

It was part of the People's case to prove that the Republican watchers were either in the conspiracy to keep the registry lists inaccessible upon election day to Mr. Gaynor's agents, or that they co-operated to that end. McKane was known to be a Democrat, but a Democrat who, for personal reasons, sometimes caused or permitted the vote of the town to be returned for the Republican candidates.

The obligations under which the Republican inspectors at this election were to him, and his official power over them, as well as their means of livelihood, were facts relevant to the probability of their co-operation with him in the objects of the conspiracy. His facility in shifting his support from one party to another, and the fact that personal likes and dislikes influenced him in doing so, were not irrelevant in this respect.

The People were permitted to put in evidence the poll lists kept at the general election for 1893 in the six election districts of the town.   Also the registry lists for 1893 of the persons qualified to vote in the same districts, as prepared and certified by the inspectors. Also the poll lists for second, third, fourth and sixth districts for the year 1892.

The defendant objected to these several lists as irrelevant, and as not competent evidence of the facts.   The poll lists of 1893, being the official record of the votes actually cast, or recorded as cast, when compared with the registry list for the same election, were material upon the question of the fraudulent character of the registry lists, and thus upon the question of motive for keeping the registry lists inaccessible.

This comparison shows that many persons whose names are in alphabetical order on the registry list are recorded upon the poll lists as voting in the same order.   Thus, the names of Ring, Rich, Richardson, Rich, Richter, Rilly, Rigney, Rumph, stand in the order here given upon the registry list of the first district.   The same names are found upon the poll list, in the same order, and as voting ballots numbered, respectively, 79, 80, 81, 82, 83, 84, 85, 86.

This remarkable coincidence of sequence in both registry and poll lists touches with striking light the question of the motive and honesty of the construction of the registry and poll lists and of the returns.   A false registry list is the obvious condition precedent of a false poll list and of false returns of the election.

The example cited is a sample of others only less striking, not only in the lists of the first district, but also in some of the other districts.   The absence of any sufficiently specified place of residence of the voter is not infrequent.

The registry list and poll list of the first district were the acts of the defendants Murphy, Morris and Brownhill, the inspectors for that district, jointly indicted with the defendant McKane, and thus pertinent to the question of their guilt.

The registry and poll lists of three of the other districts contained similar internal evidences of fabrication, and of course of similar motive.   Was this similarity in error the result of concert in crime among the several inspectors of the several districts?   The fact was

evidence relevant to the question. If of a concert of design and in crime, then a link existed between the registry lists and poll lists of the first election district and those of the other districts. It was a link that bound acts, apparently distinct, into acts concerted and executed with a community of evil purpose. It was for the judge to decide in the first instance, upon his own inspection as assisted by all the evidence, whether the link existed; if it did not, then the lists of the districts other than the first were inadmissible; if it did exist, they were admissible. To our inspection, as the case is now presented to us, the link is clearly visible, and the lists of the other districts were properly admitted.

These lists taken together tend to prove that the inspectors of the first district were co-conspirators with the inspectors of the other districts, and possibly add something to the meaning of the other evidence tending to connect McKane with the conspiracy. It is true that the conspiracy thus suggested has for its ultimate purpose a false return of a larger vote than the true one, and that the defendants are only indicted for committing some of the acts leading up to the final result. But the greater includes the less; and to the extent that we can see that the greater was accomplished, to that extent we must infer that the intermediate steps necessary to its accomplishment were also taken. While it is true as a general rule that conviction for one crime should not be obtained by proof of another, yet it is obvious that the rule does not apply where the two crimes are so related that the one involves or implies the other, or is a step in its commission.

The registry lists for 1893 contained 6,580 names as of the electors of the town. Upon the question of motive it was material to show that that number was too great.

The People placed in evidence the official enumeration of the inhabitants of the town of Gravesend, taken February 12, 1892, pursuant to chapter 5, Laws 1892, showing the whole number of inhabitants to have then been 8,343. This cast some light upon the question — it is not necessary that the light should be of absolute clearness and exactness in order to be admissible.

What is said hereafter in regard to the admission of the election returns is applicable to the admission of the census returns.

The authorities are to the effect that the courts take judicial

notice of the population of political divisions within their jurisdiction. (1 Greenl. Ev. §§ 4, 5, 6 ; *Farley* v. *McConnell,* 7 Lans. 428 ; 52 N. Y. 630 ; *Mertz* v. *City of Brooklyn,* 33 N. Y. St. Repr. 577 ; 128 N. Y. 366 ; 12 Am. & Eng. Ency. of Law, 174.) We think the census returns were properly admitted.

The defendant, to meet the charge of fraudulently increasing the vote, gave testimony on his direct examination as to the increase of the population of the town since 1890, and as to the vote of the town in 1891 and 1892.

The People, upon his cross-examination, put in evidence the election returns for 1891 in the six election districts, and afterwards in rebuttal put in the election returns for 1890 and 1892. It is apparent, we think, that when the defendant testified as to the totals of the vote in 1891 and 1892, he only testified to his recollection of the statement in the returns of such totals, and hence the returns themselves would be the better evidence. Besides, no objection was made that the returns were not duly made, and deposited in the proper custody. We thence assume that the returns were made by the proper officers, whose means of knowledge were the best possible, whose duty it was to make them, who did so under their oath of office, and who are presumed to have done their duty properly. They were made and preserved by authority of law for the benefit of the public, and they are admissible. (*Van Bergen* v. *Bradley,* 36 N. Y. 316.)

As a general rule no better evidence of the results of an election is obtainable than the official returns afford.

If the several clerks and inspectors were called as witnesses, they could not be expected to do more than to verify the accuracy of the returns, a verification which the presumption of the performance of official duty affords.

In cases in the nature of a quo warranto the returns are presumed to be true until shown to be false. (*People* v. *Minck,* 21 N. Y. 539 ; *People ex rel. Judson* v. *Thacher,* 55 id. 525.)

The defendant urges that the real purpose of the People in placing in evidence lists and returns other than those of the first election district for the year 1893, was to show that the defendant had been guilty in former years of falsifying the vote and returns. As they were admissible for legitimate purposes, the most the

defendant could do was to ask that such directions be given by the court to the jury as would limit their effect to such purposes.

The witness Maxfield testified that he went to the town hall in company with the witness Masterson, at the request of Mr. Mayer and in the interest of Mr. Gaynor, on October twenty-seventh, in order to take copies of the registry lists; these lists ought then to have been accessible in the hall.

They found a man, apparently a policeman, in charge; they told him they wanted to obtain a copy of the lists. The man told them they could not have it without an order from John Y. McKane. They saw no lists and of course obtained no copy. They returned to Brooklyn and reported to Mr. Mayer what had occurred. The People then proved by Mayer that on Monday, the thirtieth, he met the defendant in Brooklyn and stated to him what Maxfield and Masterson had said, as above stated.

The defendant then said, among other things: "I gave that man those orders;" and added, "and if you want a copy of the list, why, certainly, you can have it."

The statement made by the policeman to Maxfield and Masterson was objected to. The defendant insists that the policeman should have been called as a witness.

But when the defendant said, "I gave the man those orders," it is plain the defendant adopted as his own the acts and utterances of the policeman.

The People had to show actual obstruction, that is, the facts constituting it; the acts of the policeman and his words constitute the obstruction, or part of it; they were inadmissible unless chargeable to the defendant. The defendant, by his own statement, acknowledged that he was chargeable.

There was no need of calling the policeman; what he said and did in the act of obstruction was provable by any one who saw and heard him; and McKane made the acknowledgment of his responsibility for the policeman's acts and words with full knowledge of what they were.

In the same conversation between Mayer and the defendant, Mayer testified that defendant said: "You can have a copy of this list; I said: Will you give me such an order; he said: Yes, I will do more; I will see Johnnie Murphy, and have him telephone down

and tell the man to give you a copy of the list." Murphy is a defendant, was then in defendant's employ, and was one of the inspectors for the first election district.

Mayer testified that on the same afternoon he met Murphy in defendant's office in Brooklyn, and asked him: " Did McKane give you an order for me to get copies of the registry list at Gravesend ?" Murphy answered " No." Mayer : " Did he tell you to telephone down to the town hall to have the man in charge there let me copy those lists ?" Murphy : " No." Mayer : " Please call his attention to it ; he just promised me to do that in the street."

The defendant was absent, and the objection to the conversation last quoted is upon that ground.

The conversation was admissible. Mayer was now prosecuting his quest for the lists, through Murphy, the inspector who ought to help him and whom McKane had promised to render serviceable. It was important for Mayer to find out whether Murphy would really help him, and the direct way was to ask him. So far as Murphy was concerned he was continuing his obstruction. Incidentally Mayer obtained this information by asking if McKane had yet given him orders. If the sole point of this testimony had been to prove that McKane had not given the orders the objection, perhaps, would be valid. But the whole conversation is pertinent to the question of Murphy's guilt ; it tends to show that he was persevering in a refusal to act without an order from McKane.

Mayer further testified that still later in the same afternoon, in his own office, Mr. Gaynor and the defendant Murphy being present, McKane absent, Murphy said :

" Mr. Mayer, you are mistaken ; Mr. McKane did not say he would give you an order."

MAYER.— " He certainly did say so."

GAYNOR.— " What do you mean by saying I can't have a copy of this registry list without an order from Mr. McKane ; anybody can copy those lists, and I am going to have a copy of them."

MURPHY.— " Well, we are not going to let everybody that comes down there go in and copy this list ; we don't know that every man who comes down there is a friend, or a foe, or a thief ; Mr. McKane says he will have a copy of the list made and given to you."

GAYNOR.— " I don't want such a copy ; I am going to have

SECOND DEPARTMENT, JULY TERM, 1894. [Vol. 80.

my own copy; I am going to have a copy that can be sworn to in court."

These declarations of the defendant Murphy were themselves acts of obstruction. He thus opposed Mayer and Gaynor in their efforts to get the lists, and tried to make it more difficult for them. They were his evasive acts in his part of the crime, intended to delay and baffle Mayer and Gaynor, and not his confession or recital of past criminality. At least the jury might so regard them, and might also infer that he was still submissive to the influence of McKane.

McKane's declaration to Mayer as to the orders he would give to Murphy, and Murphy's declaration to Mayer and Gaynor showing his persistence in his obstructions, in the absence of such orders, respectively, afforded one item of evidence against McKane, and another against Murphy, showing how each one stood as to a common purpose and as to his own part in it.

Three orders were granted by Mr. Justice CULLEN on November first, one directed to the inspectors of the first election district, the others to the inspectors of the fourth and fifth districts, severally, to show cause in the Supreme Court the following day why a peremptory mandamus should not issue requiring them to allow Mr. Gaynor and his agents to inspect and copy the registry lists of each district. The witness Shanahan testified that he served the order for the fourth district upon G. Morris and Tuttle, two of the inspectors for that district. That in making the service upon Morris he told him what the papers were, and that he had just served Mr. Tuttle, "and that he (Tuttle) told me he was going to hand the paper to Mr. McKane." This remark of the witness was made in response to the question, "What did you then say to him?" meaning when he served the papers upon him. "Objected to as immaterial and incompetent."

"The COURT.— I think what he said may be taken, not what the inspector said to him."

This remark was made by the court, plainly upon the correct theory, that it was proper to receive evidence that the inspectors were at the time of and by the service of the papers fully advised of the desire of Mr. Gaynor to obtain access to the registry list. The witness in answering the question introduced, among other matters strictly within the ruling of the court, this statement of what

Inspector Tuttle had said; that statement though literally within the ruling of the court was not within the spirit of the ruling. It was for the counsel for the defendant to move to strike it out if he was not content with it. This he did not do.

To allege as error now a casual incompetent statement of the witness, unexpectedly made, but which at the time was not deemed important enough to suggest a motion to strike it out, ought not to be tolerated unless justice plainly requires it.

It appears from the evidence that McKane did assist in resisting these applications for a mandamus, and it does not seem to be material whether he did so upon the papers served upon Mr. Tuttle, or some other inspector. His assistance in defending all the inspectors with their consent is shown. Mr. Tuttle's remark that he would take one step in a transaction becomes unimportant in the presence of the evidence that the other steps he did take embrace this one and many more.

The admissibility of Mr. Grout's testimony as to the conversation over the telephone between himself and a person that he supposed to be McKane, depended upon the preliminary fact that such person was shown to be McKane. Upon the evidence there can be no reasonable doubt of it. The suggestion of the erroneous transmission by the telephone of McKane's part of the conversation seems to be founded upon Mr. Grout's inability to remember the exact words of a single sentence of it — an obvious *non sequitur*.

Mr. Mayer, in the interest of Mr. Gaynor, went to the Gravesend town hall October thirty-first, with twelve copyists, with the view of obtaining copies of the registry lists. He described the manner in which his efforts were obstructed and baffled; he was corroborated by other witnesses. It is enough to say, without going into details, that the obstructive tactics seem to have been systematic and successful.

The defendant was absent, but the evidence certainly was admissible, both as tending to imply the existence of the conspiracy, and to show the acts and declarations of the conspirators and their agents in furtherance of it.

Mr. Mayer on the same day visited Mr. Johnson, one of the inspectors of the sixth district, at his house in Gravesend, and made formal demand of him of the copy of the list which ought to have

been in his possession. It was not produced. Why not? Was it because he also was in the conspiracy?

Mr. Mayer also went to the house of Mr. Cropsey, another inspector of the same district. He did not see Mr. Cropsey, but he inquired of the lady in charge of the house, stated his business, and asked permission to see the list. The lady, answering that she knew Mr. Cropsey to be an inspector, further answered that he was absent, and she knew nothing about the matter.

Mr. Mayer testified to an interview, substantially similar, at the house of Mr. Crandall, another inspector for the sixth district.

Mr. Grout, on November thirtieth, visited the same houses, could not find the inspectors, and had a similar interview with the person in charge of each house.

Other witnesses testified to like visits, like interviews and like results at the houses of other inspectors.

The learned presiding judge said in admitting this testimony : " There is sufficient evidence upon which to base an inference that what was done with regard to these inspectors was part of a scheme which comprehended all; that the covert motive actuating the defendant with regard to all can be shown."

We think the evidence was admissible ; obstacles to the pursuit of the registry lists could not be well understood without evidence of the details both of the pursuit and the obstacles. Standing alone and apart from the defendant, any one several pursuit and its defeat might seem to be inadmissible. But the question for the jury was, did they severally stand alone and apart from the defendant, or did they stand each in its place, as part of the obstruction and defense at that place against Mr. Gaynor's search for the registry lists, and did they thus in effect stand together? Did McKane stand apart from the campaign of obstruction, or was he its leader?

This view applies to the evidence detailing the series of the attacks by Mr. Gaynor, and the resistance, offensive, defensive and repulsive, apparently planned, operated and maintained for his defeat. McKane was not always in view, but the evidence shows that he was at the front at the opening of the controversy, at several of its intermediate stages, and conspicuously so, under color of his office as chief of police, when it assumed its grosser features of personal intimidation and outrage.

The official powers of the magistrate Newton were put in requisition to effect the imprisonment of some of Mr. Gaynor's assistants. How far his official powers were lent to the support of the scheme of obstruction was a proper subject of inquiry, in view of the evidence given tending to connect him with the conspiracy.

Michael Ryan was an inspector for the second district.. He was also principal of the public school on Coney Island, a part of the town of Gravesend. When the quest for the copies of the registry lists in the hands of the individual inspectors was being made during the week preceding the election, search was unsuccessfully made for him. There were six teachers under him in the public school; one of them, Clara P. Daly, testified that he was absent from the school on Thursday, Friday and Monday preceding election day, Saturday being a holiday; that such continued absence was unusual. She was also permitted to testify to the number of pupils in the school. The counsel for the defendant assumes that this was done for the purpose of showing the disproportion between pupils and voters. But its purpose seems to have been to show that the school was large enough to need the principal's customary attendance on the days in question, and thus his absence might be referable to his co-operation in the scheme of suppressing the registry lists. The circumstance may have been slight, but we cannot say that it could not be considered in connection with the other testimony.

Several witnesses were called by the defendant who testified to his good reputation. On cross-examination the People were permitted to ask them as to his reputation in connection with certain specified transactions involving the questionable use of his power and influence. This was permissible. The defendant having introduced evidence in general terms that his reputation was good, the People certainly were at liberty to show, upon cross-examination, what it was with respect to important particulars.

Certainly so, within a reasonable range of the subject introduced by the defendant. It may be that some of the particulars thus introduced strengthened the case of the People in respect of the peculiar power and influence of the defendant among his townsmen, but in the absence of the abuse of the right of cross-examination, we cannot find error requiring reversal from the mere fact that the testimony might have touched not only the defendant's character,

but also the probability of the truth of the charge against him. To hold this to be error would be to invite a defendant, whose case is desperate, to spread a net in which to ensnare the People.

The defendant presses some objections to the charge to the jury. It is doubtful whether there are any exceptions. Written requests to charge, presented by counsel, were passed upon by the court before making the main charge. Two exceptions were then taken. At the close of the main charge one of the defendant's counsel said: " I desire to withdraw the exceptions I took." Whether he did this because he was impressed with the fairness and correctness of the charge, or because he preferred to give the jury the idea that he regarded it as favorable to the defendant — certain it is that he thus waived his right to try to procure by exception any modification of it. If the after-examination detects any errors, they will not justify a reversal, unless it is clear that they in fact prejudiced the defendant, notwithstanding the artfulness of counsel in attempting to nullify their influence.

Objection is especially made to the following portion of the charge in respect to the testimony of Mr. Mayer, already referred to, and contradicted by the defendant, to the effect that in his interview with the defendant, the latter said in effect that he did give to the person in charge of the town hall the direction not to allow any person to have a copy of the registry lists without an order from himself:

" Now, if the defendant really did acknowledge giving a direction of this kind, that admission in connection with the other circumstances of the case *would tend* to sustain the inference that at that time he already possessed control over these registry lists, if not the actual custody of them."

It may be said of all material evidence that it does tend to sustain some affirmative or negative position; its admission implies so much; it was not error for the judge to say so of the testimony in question; he did not say how strongly or feebly it tended; if he had undertaken to say that he would have been dangerously near trenching upon the province of the jury.

Elsewhere, the court brought out the distinction that while it might allude to evidence tending to establish some fact in the case, it was for the jury to determine whether they believed the evidence, and, if so, whether it did establish such fact.

We may safely assume, we think, that at the time this distinction was clearly understood.

The instructions given by the court as to the duties of the inspectors in regard to the posting and accessibility of the registry lists or copies, seem to be favorable to the inspectors, to the extreme limit of permissible liberality.

The criticisms of other portions of the charge do not seem to us to require special mention. Finally, the defendant contends that the verdict is against the evidence. The foregoing opinion is in the main confined to the examination of such of the exceptions taken upon the trial, which the defendant presses upon our attention, as seem to us worthy of written mention. This examination serves to develop to some extent the nature of the case; we do not think it necessary to undertake the additional labor of collating and arranging in lucid order the testimony necessary to a clear presentation of the whole case; it must suffice to say that we have examined it, and the examination satisfies us that the verdict is supported and justified by the evidence.

Judgment of conviction and sentence affirmed.

All concur.

Judgment affirmed.