[Criminal No. 489. Filed March 30, 1921.]

[196 Pac. 420.]

## CLIFFORD H. SMITH, Appellant, v. STATE, Respondent.

1. LARCENY—EVIDENCE HELD TO MAKE QUESTION FOR JURY AND SUPPORT CONVICTION.—On a trial for larceny of United States bonds, evidence *held* to make a question for the jury and support a conviction.

2. LARCENY—POSSESSION OF PROPERTY RECENTLY STOLEN AUTHORIZES INFERENCE OF PARTICIPATION IN THEFT.—The possession of property recently stolen is a fact from which the jury may infer that the possessor was concerned in the theft.

3. WITNESSES—CHARACTER WITNESSES MAY BE CROSS-EXAMINED AS TO KNOWLEDGE OF ACCUSATIONS AGAINST PARTY.—A witness testifying to a party's good reputation may be properly asked on cross-examination whether he has ever heard that such party has been

2. On the question as to whether possession of recently stolen property is evidence of burglary or larceny, see notes in 12 L. R. A. (N. S.) 199; 10 Ann. Cas. 1089; 19 Ann. Cas. 1281.

accused of doing acts wholly inconsistent with the character attributed to him by the witness.

4. CRIMINAL LAW—COUNTY ATTORNEY ASSUMED TO ACT IN GOOD FAITH IN CROSS-EXAMINATION OF CHARACTER WITNESSES.—Where on cross-examination of witnesses testifying to defendant's good reputation the county attorney asked whether they had heard that he was discharged by different parties for dishonesty and irregularities, and all of such witnesses denied any knowledge of such fact, it must be assumed on appeal that the county attorney acted in good faith, believing that the answers would indicate a knowledge of the existence of the rumors.

5. CRIMINAL LAW—OBJECTIONABLE CROSS-EXAMINATION OF CHARACTER WITNESSES HELD NOT TO REQUIRE REVERSAL.—The objectionable form of questions on cross-examination of witnesses testifying to defendant's good reputation concerning his discharge by different parties for dishonesty or irregularities *held* not to justify a reversal, especially in view of the fact that the answers were favorable to defendant.

APPEAL from a judgment of the Superior Court of the County of Maricopa. R. C. Stanford, Judge. Affirmed.

Mr. Weldon J. Bailey, for Appellant.

The Attorney General of the State and Mr. L. M. Laney, County Attorney, for the State.

BAKER, J.—The defendant appeals from the judgment of the superior court of Maricopa county convicting him of the crime of grand larceny, and from the order denying his motion for a new trial.

In the first place the defendant challenges the sufficiency of the evidence upon which the judgment of conviction rests. From a careful review of the record we gather the following facts: A. J. Peters purchased, and there was delivered to him, one $1,000, eight $100, and five $50 United States bonds, commonly known as, and called, Liberty Loan Bonds. He placed the bonds in a large envelope and deposited them in a safe in the office occupied by him for business purposes. The doors of this safe were left open

in the daytime. Some time about the middle of
April, 1919, Peters went to the safe to look for the
bonds and they were gone. He could not say when
the bonds were taken. Up to and for some time
prior to April 3, 1919, the defendant was in the em-
ploy of Peters as a clerk and used a desk in the office
where the safe was situated. He knew the bonds
were in the safe. He voluntarily left the employ of
Peters on April 3, 1919, and at the lunch hour of that
day, before leaving, he was alone for a time in the
office. About the middle of April, 1919, the defendant
was intoxicated in a room in a hotel in Phoenix, and
was being cared for or nursed by a lady to whom he
gave three $100 United States Liberty Loan Bonds
and one $50 United States Liberty Loan Bond. At
this time he was in possession of a number of other
United States Liberty Loan Bonds, and he told the
lady that "he had gotten these bonds from Peters,
but he said that Peters dare not say anything; that
he had too much on Peters." It is proven that the
defendant sold other United States Liberty Bonds to
various parties in Phoenix. These bonds bore the
same numbers of the bonds which Peters had pur-
chased and deposited in the safe. In April of the
same year the defendant went to San Diego, Cali-
fornia, and deposited in the safe of the hotel in which
he stopped a number of United States Liberty Loan
Bonds. He subsequently withdrew these bonds and
used them, as he said, in purchasing a diamond ring for
$400, and also betting upon the result of the city elec-
tion. Before it was positively known that the defend-
ant had been disposing of the bonds, he was informed
by one of the witnesses for the state that Peters sus-
pected him of the theft, but he then disclaimed
taking the bonds and denied that he knew anything
about them. Upon being interrogated by the offi-
cers in reference to the theft, he again denied that he

knew anything about the bonds and denied that he gave any Liberty Bonds to the nurse, and suggested that, if the bonds had been lost, that Peters' own son had stolen them. Upon the trial the defendant testified that while he was in the employ of Peters he became aware of irregularities on the part of Peters in the sale and delivery of hay to the United States government, whereby the government was defrauded out of large sums of money, and that he protested against such irregularities, and that Peters thereupon gave him the Liberty Bonds in question, and said, "Take these and go and keep your mouth shut." The defendant says that he took the bonds, and the next day left the employ of Peters. Peters positively denied that he gave the bonds to the defendant or that any such transaction as testified to by the defendant took place between them, or that he had been guilty of any irregularities in the sale of hay to the government. It was proven that prior to his arrest the defendant made no claim to the officers who interrogated him about the theft that Peters gave him the bonds as "hush money."

We think the evidence was sufficient to go to the jury and to justify the finding that the defendant is guilty as charged. The possession of property recently stolen is a fact from which the jury may infer that the possessor was concerned in the theft. Wharton on Criminal Evidence (10th ed.), par. 758. Mr. Wharton says:

"Taking up, then, the point immediately before us, we may say that a court may properly tell the jury that the possession by a party of stolen goods is a fact from which his complicity in the larceny may be inferred. But the possession must be personal, must be recent, must be unexplained, and must involve a distinct assertion of property by the defendant. If the explanation involves a falsely disputed identity or other fabricated evidence, the inference increases

in strength; and so where the goods are part of a mass of stolen property, and where the case is that of a forged instrument held by one claiming under it. But in any view the question is one of fact.''

Here the possession was recent, exclusive, and personal. The fact that the defendant on the day before he left Peters' employ was alone in the office where the safe was situated with its doors open gave him the opportunity to take the bonds unobserved. The false statement that he knew nothing about the bonds, the denial that he gave the nurse any Liberty Bonds, the failure to claim that Peters had given him the bonds at the time he was interrogated by the officers, and the suggestion that, if they were stolen, another person had committed the crime, coupled with the recent possession of the bonds, were sufficient facts to authorize the jury to infer that the defendant had stolen them. The defendant's explanation that Peters gave him the bonds as ''hush money'' must have been wholly unsatisfactory to the jury. The explanation of itself is inconsistent with an idea of honesty and integrity. It indicates that the defendant, for a money consideration was willing to compromise or conceal the commission of a crime by another. Peters denied that he gave the bonds to the defendant, and it was for the jury to determine whether they would credit or discredit the explanation in view of all the circumstances and facts proven in the case, and it is certain that they discredited it.

In the second place the defendant contends that he was deprived of a fair and impartial trial by the misconduct of the county attorney. On the trial of the case several witnesses were called on behalf of the defendant and testified that the general reputation of the defendant for honesty and integrity was good. On cross-examination these witnesses were questioned

by the county attorney, over the objections of the defendant, and answered as follows:

Witness Thompson:

"Q. Have you not heard that he [Smith] was discharged from the 'Gazette' for dishonesty in the 'Gazette'? A. Never heard that.

"Q. Haven't you heard of his being discharged by the 'Gazette' people, and then some business men, who were advertisers, interceded in his behalf, and his being re-employed, and then his being charged with dishonesty with those people again? A. Never heard that."

Witness Stauffer:

"Q. Now, he was discharged from the 'Republican,' I believe? A. I don't know that he was; not while I was employed there.

"Q. You have not heard that he was discharged from the 'Republican' on account of certain irregularities of his? A. No; I know—"

Witness Hyatt:

"Q. You did hear of his being discharged from the 'Gazette' for some dishonesty in his employment there, didn't you? A. No, sir.

"Q. Didn't you hear that that was because of his collecting from advertising customers a certain amount of money and then returning a smaller ad than that would be, only turning over to the 'Gazette' a part of what was collected. A. The first time I ever heard it."

Witness Mrs. Akers:

"Q. And did you hear why Mr. Smith was discharged from the 'Gazette'? A. Why? He was not discharged from the 'Gazette.'

"Q. Are you sure of that? A. He left of his own accord, so far as I know.

"Q. I will ask you if it is not a fact, and if you have not heard, that he was discharged once, the first time, because of irregularities in the handling of funds of the 'Gazette,' and that then certain merchants of the town with whom he had done business

came and interceded on behalf of his family, and that then he was taken back by the 'Gazette,' but that thereafter the management was obliged to discharge him again, because of his irregularities? Don't you remember hearing about that? A. Yes, sir; yes.

"Q. Then you would not say his general reputation for honesty was good, would you? A. May I say a word, please?

"Q. Well, did you hear it discussed at the time he was discharged on account of irregularities? A. No, sir.

"Q. Who did you hear say he was so discharged? A. Well, perhaps I didn't get your first question, but he was not discharged for dishonesty.

"Q. Now, I will ask you if you have not heard him say, and if it was not discussed about the office, that he was discharged for irregularities in handling the funds of the office; is not that true? A. No, sir; Mr. Smith didn't handle funds.

"Q. I mean irregularities in connection with the soliciting of advertisement for the paper? A. No.

"Q. Why did he sever his relations there? A. As I understand it, because he drank and didn't report to the office for a few days, and it was just at a time Mr. Akers needed him and he was very much provoked. That is all I ever heard."

Where a witness testifies to the good reputation of a party, he may be properly asked on cross-examination whether he has ever heard that the person in question has been accused of doing acts wholly inconsistent with the character which he has attributed to him. Such cross-examination may be had for the purpose of eliciting the data upon which the opinion of the witness is founded, and to determine whether or not such opinion is well founded. If the witness admits that rumors of misconduct are known to him, the knowledge of such rumors may well be inconsistent with his assertion that the person's reputation is good. 1 Greenleaf on Evidence (16th ed.), 588; Rice on Criminal Evidence, p. 603; 1 Wigmore

on Evidence, par. 197; *Jung Quey* v. *United States,* 222 Fed. 766, 138 C. C. A. 314; *People* v. *Gordon,* 103 Cal. 568, 37 Pac. 534; *Ingram* v. *State,* 67 Ala. 67; *State* v. *Jerome,* 33 Conn. 265; *Cook* v. *State,* 46 Fla. 20, 35 South. 665; *Ozburn* v. *State,* 87 Ga. 173, 13 S. E. 247; *Smith* v. *State,* 10 Ind. 106; *State* v. *Arnold,* 12 Iowa, 479; *Newton* v. *Commonwealth* (Ky.), 102 S. W. 264; *State* v. *Donelon,* 45 La. Ann. 744, 12 South. 922; *State* v. *Beckner,* 194 Mo. 281, 3 L. R. A. (N. S.) 535, 91 S. W. 892; *McCormick* v. *State,* 66 Neb. 337, 92 N. W. 606; *State* v. *Campbell,* 20 Nev. 122, 17 Pac. 620; *State* v. *Perkins,* 66 N. C. 126; *People* v. *McKane,* 80 Hun, 322, 30 N. Y. Supp. 95; *State* v. *Ogden,* 39 Or. 195, 65 Pac. 449; *People* v. *Hite,* 8 Utah, 461, 33 Pac. 254.

We cannot assume that the county attorney did not believe that the witnesses had ever heard of the existence of the rumors referred to in the questions or that he knew or had reason to believe that the witnesses had no knowledge of such rumors or that the knowledge of such rumors did not affect their testimony. We must assume, on the contrary, that the county attorney acted in good faith, believing that he had the legal right to ask the questions, and that the answers would indicate a knowledge of the existence of the rumors. It is true that some of the questions were objectionable as to form, and at least one expression should not have been made: "Now, he was discharged from the 'Republican,' I believe." But we do not think that these errors justify a reversal of the judgment, especially in view of the fact that the answers of the witnesses were favorable to the defendant. If the county attorney in this case was wrong in putting the questions to the witnesses, it may be said of him, as it was said of the district attorney in *People* v. *Gordon, supra:*

"He was in such good company and backed by such an array of authority that no inference of intended oppression or injustice to the defendant can be presumed, and to suppose that the jury was unduly influenced thereby is to place a very low estimate upon their intelligence and capacity."

We cannot say that there has been a miscarriage of justice in the case.

The judgment of conviction and the order denying a new trial are affirmed.

ROSS, C. J., and McALISTER, J., concur.